In re WEBSTER CLOTHES, INC. d/b/a
Webster Men's Wear, Debtor.

**Bankruptcy No. 80–2–2470L.**

United States Bankruptcy Court,
D. Maryland.

Jan. 5, 1984.

Jerome D. Carr, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for debtor-in-possession.

Sanford A. Harris, Sagner, Stevan & Harris, Baltimore, Md., and Andronike A. Tsagaris, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for Forbes-Cohen.

Charles M. Tatelbaum, Sherbow, Shea & Tatelbaum, Baltimore, Md., for unsecured creditors' committee.

## ORDER APPROVING APPLICATION TO ASSUME EXECUTORY CONTRACT

JAMES F. SCHNEIDER, Bankruptcy Judge.

This is a proceeding initiated by the application of Webster Clothes, Inc. ["Webster"] for authority to assume an unexpired lease for retail premises located in Lansing Mall, Michigan, for the remaining term, including the five-year renewal period provided thereunder. The landlord, Forbes-Cohen Properties ["Forbes-Cohen"], has objected. The objection will be overruled and the application approved.

### FINDINGS OF FACT

1. On December 29, 1980, Webster filed a petition under Chapter 11 of the Bankruptcy Code ["Code"]. Throughout the proceedings, Webster continued in the operation of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Code.

2. By lease agreement dated March 15, 1968, [the "Lease"], Webster Lansing, Inc., a wholly-owned subsidiary of Webster, leased from FCA Properties, a Michigan co-partnership, premises within the shopping center known as Lansing Mall, Delta Township, Eaton County, Michigan (Lansing No. 50) [the "Premises"].

3. The Lease was assigned to Webster before the commencement of the Chapter 11 proceeding.

4. Forbes-Cohen is the successor in interest to FCA Properties under the Lease and a duly noted creditor in these proceedings.

5. The original term of the Lease commenced on August 1, 1968 and expired on July 31, 1983. In addition to a $12,600 minimum annual rent, Webster is required to pay percentage rent equal to four percent (4%) of gross sales during each lease year, less the $12,600 minimum rent. Webster also pays certain additional costs such as utilities, common area and maintenance, and real estate taxes.

6. Except for a brief period immediately before the commencement of these proceedings, and for all periods after the institution of these proceedings, Webster has remained current on its obligations under the Lease. Webster owes Forbes-Cohen $5,843.44, representing pre-petition percentage rent, excess real estate taxes, and other miscellaneous charges.

7. On October 20, 1981, Webster and its wholly-owned subsidiary, Meadows Associates, Inc. ["Meadows"], filed a plan of reorganization ["Plan"] and a proposed Disclosure Statement. Article V of the Plan provided for the assumption of all executory contracts upon confirmation of the Plan except for those contracts previously rejected and disaffirmed as of the confirmation date or as to which an application to reject and disaffirm was then pending.

8. Pursuant to a Notice dated November 2, 1981, copies of the Plan and the proposed Disclosure Statement were mailed to all creditors and other interested parties (including Landlord), all of whom were permitted an opportunity to file objections to the proposed Disclosure Statement.

9. On March 29, 1982, this Court held a hearing on the proposed Disclosure Statement and the objection filed by The First National Bank of Maryland ["FNB"]. At that time, the Court approved the Disclosure Statement upon the incorporation of certain modifications and additions. A revised Plan and Amended Disclosure Statement were filed with the Court on October 20, 1982, and the Disclosure Statement was approved by Order dated October 22, 1982. Article VI of the revised Plan dealing with executory contracts, is identical to the provisions of Article V of the original Plan.

10. Article I, Section 1.03 of the Lease contains a provision which gives Webster the right to extend the term of the Lease as follows:

"Tenant shall have the right, if it is not in default hereunder, upon not less than one (1) year's written, advance notice, to extend the term of this lease for one (1) additional five (5) year period, upon the same terms, conditions and rentals set forth herein."

On June 2, 1982, more than one year before the end of the term, Webster notified Forbes-Cohen of its intention to exercise the renewal right [the "Option"].

11. By letter dated July 6, 1982, Forbes-Cohen stated that it would not recognize Webster's exercise of the extension provision unless the Lease was first assumed by Webster and Forbes-Cohen was provided the requisite adequate assurance under section 365 of the Code, including the payment of the pre-petition arrearage. Forbes-Cohen also sent a copy of this letter to the Court.

12. On August 30, 1982, Webster applied for authority to assume the lease, including the Option.

13. On December 20, 1982, the Plan was confirmed, and every Webster executory contract and lease (there were 71 other store leases) was assumed, except that the status of this Lease was left to be considered in these proceedings. The Court also determined that adequate assurance under § 365 was provided in each case by the payment of the prepetition arrearage.

14. Pursuant to the provisions of the Plan, Webster has made the initial required payments to Equitable Bank, N.A. and FNB, and the full payment of all undisputed amounts to all priority and unsecured creditors. Within 75 days after confirmation, a total of approximately $4,800,000 had been distributed.

15. Webster's store located on the Premises is one of its most profitable operations, ranking in the top 15 outlets out of 72 locations. The store produced an operating profit of $81,300 for the fiscal year ending January 30, 1982 and it produced an operating profit of $43,500 for the first six month period ending July 31, 1982.

16. For its fiscal year ending January 30, 1982, Webster produced a net profit of $514,800.00. In the first six months of the fiscal year ending January 29, 1983, Webster produced a net after tax profit of $227,000.

## CONCLUSIONS OF LAW

1. The Lease is an "executory contract or unexpired lease" within the meaning of section 365 of the Code.

2. The Option is an integral part of the Lease and cannot be treated independently from the remaining provisions of the Lease. The Option is one of the bundle of rights which served as a basis for Webster's agreement to be bound by the financial and non-financial covenants of the Lease. The Option is not independent of the other provisions of the Lease so as to preclude the application of section 365.

3. A debtor-in-possession, such as Webster, may assume or reject an executory contract or unexpired lease at anytime prior to the confirmation of the Plan or in the Plan itself, if the executory contract or unexpired lease has not previously been rejected under section 365. Sections 365(d)(2); 1107(a); 1123(b)(2).

4. If the Debtor is in default at the commencement of the Chapter 11 proceeding, as Webster was, the Code requires the debtor-in-possession to (1) cure existing de-

faults or provide adequate assurance that such defaults will be promptly cured; (2) compensate other parties to the lease for actual pecuniary losses resulting from the Debtor's default or provide adequate assurance of compensation; and (3) provide adequate assurance of future performance under the lease. Section 365(b)(1). For a shopping center lease, additional assurances are required, including adequate assurances of (1) the source of the rent and other consideration due under the lease; (2) that percentage rent due under the lease will not decline substantially; (3) that assumption of the lease will not breach certain provisions in other agreements relating to the shopping center; and (4) that assumption will not substantially disrupt the tenant mix in the shopping center. Section 365(b)(3).

■ 5. A necessary corollary (1) of the debtor-in-possession's right to assume or reject an executory contract or unexpired lease as late as the confirmation of the plan and (2) of the absence of a requirement that the debtor-in-possession immediately cure defaults or tender such a cure is the preservation of the status quo until the debtor-in-possession decides whether to assume or reject. *See Executive Square Office Bldg. v. O'Connor,* 19 B.R. 143, 146 (Bkrtcy.N.D. Fla.1981); *cf. Matter of Gulfco Investment Corp.,* 520 F.2d 741, 743 (10th Cir.1975).

■ 6. If the debtor-in-possession does assume an executory contract or unexpired lease its title to the contract or lease relates back to the filing of the petition. *2 Collier on Bankruptcy* (15th ed. 1983) § 365.03[2], p. 365–24.

7. Forbes-Cohen relies heavily on *Schokbeton Industries, Inc. v. Schokbeton Products Corporation,* 466 F.2d 171 (5th Cir. 1971), and its ringing evocation of "the universally recognized rule that a trustee cannot accept the benefits of an executory contract without accepting the burdens as well." *Id.,* 466 F.2d at 175. *Schokbeton* also holds that the statutory predecessor of 11 U.S.C. § 108 (1982) "provides no basis for suspending the debtor's obligations under an executory contract while simulta-

neously holding the other party to the bargain." *Id.,* 466 F.2d at 176.

8. However *Schokbeton,* which may have been overbroad on its own facts and law, *Good Hope Refineries, Inc. v. Benavides,* 602 F.2d 998, 1002 (1st Cir.1979), *cert. den.,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979), is distinguishable on law from this lease assumption. The *Schokbeton* court dealt with the Bankruptcy Act, which had no stay comparable to that of section 362(a)(3) of the current Bankruptcy Code. *In the Matter of McLouth Steel Corp.,* 20 B.R. 688, 691 (Bkrtcy.E.D.Mich.1982). Also, section 365 represents a major departure from the Bankruptcy Act's provisions for lease assumption:

> Now, if the termination of a lease has not yet been completed under state law, a trustee may assume and undertake to cure in the manner provided under § 365(b) irrespective of the lapse of grace provisions in the lease itself and irrespective of whether immediate funds are available. The right to cure and the method of cure are no longer required to be upon the precise terms as provided in the lease. Under § 365(b), so long as the lease had not yet been terminated, a trustee may assume irrespective of whether or not any contractual grace period for the curing of defaults has expired and irrespective of whether he has the immediate present ability to fully cure any rent arrearage.

*Executive Square Office Bldg., supra,* 19 B.R. at 146.

9. *Schokbeton* is also distinguishable on its facts. *Schokbeton* dealt with the termination or expiration of a franchise. This case deals with the assumption of a lease and the exercise of an option to renew. In *Schokbeton,* the licensor sent the debtor a default notice which automatically terminated the debtor's franchise at the end of a 60-day cure period. Twenty-five days after the notice was mailed, the debtor filed for rearrangement. More than four months after the end of the cure period, the debtor sought to enjoin the licensor from awarding the exclusive franchise to another party.

The *Schokbeton* court held that the franchise expired by its own terms at the end of the cure period. The licensor did not need to act after the debtor petitioned for relief in order for the franchise to expire. In this case, however, both Webster's attempt to exercise its renewal option, and Forbes-Cohen's refusal to recognize the exercise came after the filing of the petition for relief and before the statutory deadline for Webster to assume or reject the lease. The only pre-petition matter here is Webster's pre-petition default on the Lease, a default which the Bankruptcy Code requires that Webster cure *promptly after assuming the lease*. The *Schokbeton* debtor tried to indefinitely extend the time to cure the defaults under its franchise. That debtor was guilty of laches. Webster has sought to exercise the renewal option within the time limits of the Lease. Unlike the *Schokbeton* debtor, Webster has not sought to avoid the burden of the Lease, except for curing pre-petition defaults prior to assuming the Lease.

■ 10. If the other party to an executory contract or unexpired lease, such as Forbes-Cohen, desires that the debtor-in-possession assume or reject the contract or lease prior to the confirmation of a plan, it may request that the Court order the debtor-in-possession to determine within a specified period whether to assume or reject the contract or lease. Section 365(d)(2).

■ 11. The Court need not reach the issue of whether assumption of the unexpired lease extended the time to exercise the Option or whether the Option could be exercised *nunc pro tunc* at the time of the assumption. Having failed to avail itself of the statutory procedure for securing an earlier assumption or rejection of the lease, Forbes-Cohen will not be heard to complain that Webster had not assumed the lease at the time it exercised the Option. Because Webster's first plan of reorganization provided for the assumption of the lease, because Webster's store in Forbes-Cohen shopping center was profitable, and because Webster had exercised the Option, Forbes-Cohen should have been aware of Webster's

intention of assuming the Lease. This Court need not reach the issue of whether exercising the Option estopped Webster from later attempting to reject the Lease because Webster has not attempted to reject the Lease.

12. Webster effectively exercised the Option by sending its letter of June 2, 1982 to Forbes-Cohen.

■ 13. Federal, not state law, is determinative because this matter is governed by the provisions of section 365(b) for curing defaults in executory contracts and unexpired leases. *Executive Square Office Bldg., supra,* 19 B.R. 143, 146.

■ 14. Webster's default under the Lease on June 7, 1982, in not paying $5,843.44 in pre-petition percentage rent, excess real estate taxes and miscellaneous charges was a minor default. This is particularly so because the default was solely for the nonpayment of the pre-petition charges which are entitled to a priority in payment only if the lease is actually assumed.

15. As a court of equity, this Court is loathe to enforce a forfeiture of the Option on the basis of a minor default. Webster's effective exercise of the Option deprives Forbes-Cohen only of the chance to relet the Premises to another tenant at a higher rent, a windfall. To hold that Webster has not exercised the Option would be to deprive the estate of a valuable asset and frustrate the cure provisions of section 365. *See In re Belize Airways, Inc.,* 5 B.R. 152 (Bkrtcy.S.D.Fla.1980).

16. Forbes-Cohen's has shown no compensable, pecuniary loss from Webster's minor default. Nor will Forbes-Cohen suffer a loss from Webster's exercise of the Option merely because Forbes-Cohen will be unable to rent to another tenant at a substantially higher rate.

In considering whether a renewal may be enforced without "loss" or "harm" to a landlord, it is clear that these terms do not include the loss of an opportunity to put a tenant in default. One court wrote: "... the test is not that one party

may be able to profit by the failure of another, but rather that he does not lose an advantage which he would have had had no failure occurred."

*Friedman on Leases,* § 14.2, p. 583 (1974), quoting *Monihon v. Wakelin,* 6 Ariz. 225, 234, 56 P. 735, 737 (1899), and citing *Xanthakey v. Hayes,* 107 Conn. 459, 140 A. 808 (1928).

17. Similar issues were raised in a recent case: *In the Matter of Opus One, Inc.,* 33 B.R. 190 (Bkrtcy.W.D.Pa.1983). The *Opus One* court held that the debtor's exercise of an option to extend the term of a lease was effective despite the debtor's failure to give the required six-month notice by certified mail. The Court relied on the landlord's actual knowledge of the debtor's intention to extend and on a finding that the noncompliance was only technical to hold that the option had been exercised. *Id.,* 33 B.R. at 194.

18. Significantly, the *Opus One* lease permitted the exercise of the option only if the lessee was not in default. Acting on the landlord's application that the Court require the debtor to either assume or reject the lease, the debtor assumed the lease a month and a half before the deadline for exercising the option. The lease assumption order provided for payment of the $12,952.76 rent arrearage at the rate of $1,000 per month over a time extending well into the option period. Implicit in the Court's holding that the option had been effectively exercised is a finding that the Order for periodic payment of the arrearage satisfied the requirement that the lessee not be in default when the option was exercised.

19. Webster's assumption of the Lease as extended through July 31, 1988, will be beneficial to the estate.

20. Webster will be ordered to cure the pre-petition default under the lease in the amount of $5,843.44 within fourteen (14) days of the date of this Order. Upon payment of the pre-petition arrearage, Webster will have furnished adequate assurance of future performance under the lease as required by 11 U.S.C. § 365 (1982). Forbes-Cohen's objection to the Debtor's application for authority to assume the Lease as extended will be denied.

21. Webster will be authorized to take such actions and execute such documents as may be necessary to effectuate the assumption of the Lease.

SO ORDERED.