In re The CIRCLE K CORPORATION, et al., Debtors.

COLEMAN OIL COMPANY, INC., a New Hampshire corporation, Appellant,

v.

The CIRCLE K CORPORATION, et al., Appellees.

BAP No. AZ–94–1422–JMeR.
Bankruptcy Nos. 90–5052–PHX–GBN
to 90–5075–PHX–GBN.
Adv. No. 91–974–GBN.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Sept. 28, 1994.

Decided Dec. 11, 1995.

Amended Opinion Jan. 8, 1996.

Carolyn J. Johnsen, Phoenix, AZ, Appellant.

James L. Rasmussen, Albuquerque, NM, James T. Reist, Albuquerque, NM, Appellees.

Before JONES, MEYERS and RUSSELL, Bankruptcy Judges.

## AMENDED OPINION

JONES, Bankruptcy Judge:

A lessor leased nine gasoline service stations in New Hampshire and Maine to a lessee. The lease agreement was for ten years but could be renewed for two additional five-year periods. Through a series of mergers, acquisitions, and dissolutions, six of the stations ended up in the Circle K family of convenience stores.

Circle K declared bankruptcy and its subsidiaries gave notice that they intended to renew the leases even though the leases had not been assumed. Instead of moving to force Circle K to assume or reject under § 365(d)(2),[1] the lessor filed an adversary complaint arguing that the leases could not be renewed because (1) Circle K was not a proper assignee; (2) the leases were in default; and (3) the leases had not been assumed. Circle K moved for and was granted summary judgment. The lessor appeals. We **AFFIRM.**

## I. FACTS

On November 21, 1977, Coleman Oil Company, Inc. ("Coleman") and Pickering Oil Heat, Inc. ("Pickering") entered into multiple ten-year lease agreements. The leases covered the following convenience store locations in Maine and New Hampshire: (1) Kittery; (2) Epping; (3) Exeter; (4) Dover; (5) Portsmouth; and (6) Durham. Paragraph 3 of the leases gave Pickering the following renewal rights:

> Lessee shall have two (2) additional and successive terms of five (5) years each on the same terms and conditions as during the original term (except there shall be no extension rights beyond the two contained in this paragraph), by giving Lessor at least six (6) months written notice of such extension prior to the expiration of the original or any extended term as the case may be, provided that Lessee's right to extend is conditioned upon the Lessee not being in default hereunder and is not in default of payments under any of the other leases described on Schedule C attached hereto.

The first option to renew the leases needed to be exercised on or about June 1, 1987. The second option to renew needed to be exercised on or about June 1, 1992.

NPI Corporation ("NPI") acquired Pickering's stock and other assets on December 31, 1983. NPI is the parent company of Debtor New England Petroleum Distributor ("New

---

1. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq.*

England") and Debtor Old Colony Petroleum, Inc. ("Old Colony"). New England claims that it is the valid holder of an assignment of the leases on the Kittery, Epping, Exeter, and Dover properties. Old Colony claims assignment of leases on the Portsmouth and Durham locations. NPI merged with Charter International Oil Company ("Charter") on December 27, 1989. Circle K had previously acquired Charter on May 6, 1988, by purchasing all of its stock. During all of these transitions Coleman received and accepted the bargained for lease payments of $1,250 per month for each location.

On March 9, 1987, New England sent letters to Coleman exercising the option to renew the leases. On May 18, 1987, Old Colony also sent Coleman written notice that it was exercising its option to renew. Coleman did not object to the renewals, and continued to accept rent from both companies for the leased properties.

On May 15, 1989, Coleman informed its counsel that it might have to begin eviction proceedings, due to various defaults under the leases, unless New England and Old Colony could cure their defaults. Circle K, Old Colony, and New England, together with the rest of the Circle K family (collectively referred to as "Debtors"), filed for chapter 11 protection on May 15, 1990. The Debtors requested, and received, several orders during the bankruptcy proceedings granting extensions of time within which to assume or reject unexpired leases of nonresidential real property. See 11 U.S.C. § 365(d)(4) (1994) (requiring assumption of leases of nonresidential real property within 60 days of filing the petition unless an extension is granted by the bankruptcy court).

Coleman filed an adversary proceeding on October 11, 1991, seeking a declaration that Circle K was a tenant-at-will with no right to renew the leases, and also seeking relief from stay to terminate the leases. On March 5 and March 31, 1992, New England and Old Colony sent letters to Coleman exercising the option to renew for the second 5–year period. The Debtors then moved for summary judgment in the adversary proceeding, asking the court to decide as a matter of law that (1) the Debtors were the legal assignees

of the leaseholds and thus entitled to renew the leases; and (2) that the Debtors' renewal of the leases was effective even though the Debtors were in default in contravention of the lease's specific condition precedent. The bankruptcy court granted the motion for summary judgment on April 6, 1994. Coleman appeals.

## II. ISSUES

1. Did the bankruptcy court err in holding as a matter of law that the Debtors are proper assignees of the Pickering lease?

2. Did the bankruptcy court err in holding as a matter of law that the Debtors could exercise their option to renew the leases even though the Debtors were in default, in contravention of the lease's specific condition precedent?

## III. STANDARD OF REVIEW

■ We review a grant of summary judgment de novo. E.g., In re Hyman, 123 B.R. 342, 344 (9th Cir. BAP 1991), aff'd, 967 F.2d 1316 (9th Cir.1992). On motion for summary judgment, the moving party has the burden to show that there are no genuine issues of material fact and therefore they are entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

Coleman attacks the grant of summary judgment on three fronts. First, Coleman argues that there are unresolved factual issues concerning the propriety of the Debtors' lease assignments which preclude a grant of summary judgment. Second, Coleman argues that the assignments are legally invalid under the statute of frauds because the assignments are not evidenced by a writing. Finally, Coleman argues that even assuming that the Debtors are valid assignees or successors, a chapter 11 debtor may not exercise an option to renew a lease unless the debtor first assumes the lease and cures any defaults. We address each of these arguments in turn.

## A. *Assignment of the Leases*

■ Coleman argues first that there are factual issues that must be resolved in order to determine whether the Debtors have a legal interest in the leasehold. Coleman points to the somewhat confusing series of mergers and acquisitions, the lack of written assignments to New England and Old Colony, and the lack of notice to Coleman of any purported assignments. The terms of the leases do not support these arguments.

The November 21, 1977 contract between Coleman and Pickering provides as follows:

> 11. Lessee shall have the right and privilege to assign this Lease or sublet said Premises in whole or in part, any extension thereof, upon such terms as to it shall seem best, PROVIDED, HOWEVER, that in the event of an assignment or sublet the Lessee shall remain primarily liable on said Lease.
>
> . . . . .
>
> 22. The word "Lessor" herein shall be construed to include the said Lessor and Lessor's heirs, representatives, successors and assigns, as the case may be, and "Lessee" herein shall be construed to include the said Lessee, its successors and assigns.

The bankruptcy court interpreted this language as follows:

> The lease agreement itself specifically notes that the Lease is binding upon the parties and their successors and assigns.... The term Lessee itself is specifically construed to include successors and assigns.

The bankruptcy court found nothing in the contract to indicate that a formal assignment was required before a related entity could exercise the right to renew. The court also found nothing in the contract to indicate that Coleman required notice of assignments. The only requirement was that the original lessee, Pickering, would remain primarily liable under the lease. Finally, applicable Massachusetts law states that the surviving corporation of a merger or a consolidated corporation is vested with all right, title and

interest in "all of the property, real, personal, or mixed" of the original corporation. Mass.Gen.L. Ch. 516 §§ 46(a)(4), (b), and (c) (1991).[2]

Having moved for summary judgment, the initial burden of showing an absence of any issues of material fact was upon the Debtors. We feel that the Debtors met their burden. The Debtors provided affidavits and documents concerning the numerous mergers, acquisitions and dissolutions. The bankruptcy court made the following conclusions:

> So in short, with respect to the Portsmouth and Durham stores, the chain of ownership of lessee's interest is as follows: Pickering to Pickering Old Colony, Inc., to Northeast Petroleum Corporation, to Old Colony Petroleum Company. With respect to the Epping, Exeter, Kittery and Dover stores, the chain of ownership in the lessee's interest is as follows: Pickering to Pickering Old Colony, Inc., to Northeast Petroleum Corporation, to New England Petroleum Distributors, Inc.

We agree with the bankruptcy court's conclusion that the documents presented by Debtors showed a chain of transfer of the subject leases.

■ Pursuant to *Celotex,* once the moving party has met its burden, the opposing party then has the burden to come forward with a more convincing showing that summary judgment is not appropriate. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Coleman argues that the chain of assignment is too confusing to follow. Coleman also argues that there are holes in the paper trail presented by Debtors, and that Debtors' later behavior was inconsistent with the notion of an earlier assignment.

Coleman does not successfully argue that the chain of assignment is deficient as a matter of fact or that the contract between Coleman and Pickering required documentation of assignments. Therefore, Coleman has failed to meet its burden pursuant to *Celotex.* We agree with the bankruptcy court's conclusion that no formal assignment

---

**2.** Massachusetts is the state of incorporation of Old Colony, New England, NP Corp., NPI, and Pickering.

of the leases or notice to the landlord was contemplated or required by the lease terms. Therefore, we affirm the bankruptcy court's decision that the Debtors were proper assignees of the lease, and therefore had the right to exercise the renewal option.

### B. *Applicability of the Statute of Frauds*

■ Coleman next attempts to raise a statute of frauds defense. It argues that a leasehold interest is subject to the statute of frauds and therefore the lease assignments at issue are invalid because they are not evidenced by a writing.

The bankruptcy court ruled that the statute of frauds was inapplicable because Coleman was not a party to the assignments. It concluded that third parties cannot assert the statute of frauds as a defense to an action by the direct parties to a contract because the statute of frauds is a shield, not a sword. Because the statute is intended to prevent fraud by one of the contracting parties on the other, if those parties recognize the contract, the protection afforded by the statute is unnecessary. *Chapman v. Ford*, 246 Md. 42, 227 A.2d 26, 31 (1967); *see also* Restatement (Second) of Contracts § 144 (1981) (stating that only a party to a contract or a transferee or successor of a party to the contract can assert that the contract is unenforceable under the statute of frauds).

We agree with this conclusion and therefore affirm the bankruptcy court's ruling that the statute of frauds is inapplicable in this case.

### C. *Exercise of the Renewal Option in Bankruptcy*

■ Coleman next argues that the Debtors' attempt to exercise the renewal right for the final five-year option must fail because the Debtors were in default at the time they attempted to exercise the option to renew.[3] Coleman argues that the Debtors would have had to assume the lease and cure the defaults before they could exercise the right to renew. Since the Debtors failed to cure the defaults and assume the lease before the option period ran, the leases expired and there is nothing for the Debtors to now assume.

The heart of Coleman's argument against the Debtors' assumption of the leases lies in the conflict that often occurs between bankruptcy law and state law contract rights. Under paragraph 3 of the leases, a lessee could not exercise the option to renew a lease for another five-year period if the lessee was in default on the lease payments. At the time the Debtors attempted to exercise the option to renew, they were in default on the leases. It is therefore arguable that outside of bankruptcy, Coleman might have refused to accept the renewal unless the Debtors cured the minor defaults.[4]

The dissent argues that the same result should occur in bankruptcy; i.e., that the Debtors should be required to cure all pre- and postpetition defaults, no matter how small, in the time specified within the leases in order to exercise their option to renew. We disagree, and for the reasons discussed below hold that a debtor who is a lessee under a lease which conditions renewal upon not being in default may exercise its option to renew without first curing the default or assuming the lease.

#### 1. *Section 365(d)*

The current version of § 365(d)(2) states that in a case under chapter 11, a trustee may assume or reject an unexpired lease of residential real property at any time before confirmation of the plan, unless the landlord

---

3. The Debtors had defaulted both pre- and postpetition. While the exact amount and nature of the alleged defaults is unclear, the bankruptcy court characterized them as *de minimis*. The prepetition defaults apparently involved the failure by the Debtors to maintain the Kittery property in good repair and to pay property taxes in the amount of $4,470 on the Durham and Portsmouth stores. All postpetition property taxes were paid before Circle K exercised the options to renew, and the bankruptcy court stated that the amount of postpetition defaults existing at the time of renewal were alleged to be less than $200.

4. It is by no means certain that outside of bankruptcy Coleman could have refused to accept the Debtor's attempt to exercise their option to renew. As the dissent points out, state anti-forfeiture law may have prevented Coleman from refusing to allow Circle K to renew the leases due to the *de minimis* nature of the defaults.

asks for, and receives, a court order forcing the trustee to assume or reject the lease within a specified period. 11 U.S.C. § 365(d)(2) (1994). Section 365(d)(4) states that a trustee must assume an unexpired lease of nonresidential real property within 60 days of filing the petition, unless the trustee asks for a longer period of time. 11 U.S.C. § 365(d)(4) (1994).

Prior to the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), however, § 365 did not create a distinction between residential and nonresidential leases of real property.[5] In both cases a chapter 11 debtor in possession had until plan confirmation to decide whether to accept or reject an unexpired lease of real property, subject only to the landlord's right to ask the bankruptcy court to shorten that period. In pre-BAFJA decisions, therefore, landlords often brought motions to have the assumption/rejection period shortened. Some of these decisions involved situations similar to the instant appeal—an attempt by a debtor to exercise an option to renew an unexpired lease before actually assuming the lease and curing any defaults. Because the landlord had to come into court in order to shorten the assumption/rejection period, these decisions created a rule that turned on whether or not the landlord had asserted that "right."

This rule was first enunciated in *In re Webster Clothes, Inc.*, 36 B.R. 260 (Bankr. D.Md.1984). In *Webster*, the bankruptcy court allowed a debtor to exercise his option to renew an unexpired lease even though the debtor had defaulted prepetition. The court based its holding on various factors, including a statement that "[h]aving failed to avail itself of the statutory procedure for securing an earlier assumption or rejection of the lease, [the landlord] will not be heard to complain that [the debtor] had not assumed the lease at the time it exercised the Option." [6] *Id.* at 264.

The rule was also applied in *In re Cook United, Inc.*, 53 B.R. 342 (Bankr.N.D.Ohio 1985). In *Cook United*, the landlord had requested, and received, a court order forcing the debtor to assume or reject the unexpired lease within 60 days. For that reason the court held that the debtor could not renew the lease unless it first assumed the lease and cured all defaults. *Id.* at 345. The court's opinion, however, clearly indicates that until a landlord files a motion asking the court to force the debtor to assume or reject the leases, "the federal policy to allow the debtor time to decide whether or not it will promptly cure a default outweighs state law contract provisions to the contrary." *Id.*

A similar situation also arose in *In re Revco D.S., Inc.*, 111 B.R. 626 (Bankr. N.D.Ohio 1989). Although *Revco* arose after the BAFJA amendments, the debtor requested, and received, an order extending the period for assuming the lease until plan confirmation. Applying the *Webster* analysis, the court held that the debtor could "exercise its right to renew the Lease without assuming the Lease and curing the prepetition [default]," *id.* at 630, because the landlord had not "requested the Court to order debtor to assume or reject within a specified period of time." *Id.* at 629.

■ We agree with the reasoning of the above cases. However, given the current version of § 365 which places the burden on the debtor to seek an extension of time within which to assume or reject an unexpired lease of nonresidential property, we decline to base our decision on whether or not the landlord has sought a court order compelling the debtor to assume or reject within a specified time. Instead, we hold simply that a debtor who has defaulted prepetition on an unexpired lease may exercise its option to renew that lease without first assuming the

---

5. BAFJA amended § 365(d) by adding § 365(d)(2), which required assumption or rejection of an unexpired lease of nonresidential real property within 60 days after the order for relief. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 362, 98 Stat. 333, 361 (1984); 2 Lawrence P. King, *Collier on Bankruptcy*, ¶ 365.03 at 365–24 n. 1 (15th ed. 1995).

6. The other determining factors were that (1) section 365 governed the cure of defaults in unexpired leases; (2) the prepetition defaults were minor; and (3) the landlord had demonstrated no compensable, pecuniary loss resulting from the debtor's default. *Webster*, 36 B.R. at 264.

lease or curing any prepetition defaults. Of course, such exercise must be conditioned upon the eventual assumption of the lease within the applicable time period and cure of all defaults in compliance with the requirements of § 365(b)(1).

 The policy behind the Bankruptcy Code supports such a rule of law. The purpose behind § 365 is to balance the state law contract right of the creditor to receive the benefit of his bargain with the federal law equitable right of the debtor to have an opportunity to reorganize. *See Webster*, 36 B.R. at 263. This is accomplished by forcing the debtor to abide by the contract provisions during pendency of the bankruptcy and cure any prepetition defaults upon assumption while prohibiting the creditor from enforcing any prepetition default remedies. 11 U.S.C. §§ 365(b)(1), 365(d)(3), 362(a)(3) (1994). This balance, we believe, allows a debtor to exercise an option to renew an unexpired lease without first curing any prepetition defaults.[7] Coleman will receive the benefit of its bargain when, on assumption of the leases, Debtors are required to cure all pre- and postpetition defaults.

The dissent initially states that no other court has ever stated the rule of law which we adopt in this decision. However, as the above discussion demonstrates, our decision *is* supported by *Revco, Cook,* and *Webster.* The dissent disagrees with the holdings of these cases by concluding that they "represent judges 'legislating' a result" with no statutory authority. We decline to accept that characterization of these holdings, preferring to instead to view them as proper exercise of a bankruptcy court's authority to interpret the Bankruptcy Code in situations where the Code does not clearly resolve an issue.

The dissent quotes one statement from *Cook United* for what it believes is the correct view of this issue—that a bankruptcy court "has no authority to modify or nullify contractual provisions." *Cook United,* 53 B.R. at 345. However, the bankruptcy court in *Cook United* cited *In the Matter of Schok-*

*beton Indus., Inc.,* 466 F.2d 171 (5th Cir. 1972), as authority for this proposition. As the following discussion indicates, the reasoning behind *Schokbeton* is clearly inapplicable.

*Schokbeton* was a case decided during an "arrangement proceeding" under Chapter XI of the Bankruptcy Act and which concerned the termination of a franchise agreement. There was no automatic stay in Chapter XI arrangement proceedings; instead, § 314 gave the court discretion to enjoin or stay the commencement or continuation of any suits against property of the debtor and to enjoin or stay any act to enforce any lien against property of the debtor. Bankruptcy Act of 1898, 30 Stat. 544 (1898) (as amended by the Chandler Act, Pub.L. No. 75–696, § 314, 52 Stat. 840, 907 (1938)), *repealed by* Bankruptcy Reform Act of 1978, Pub.L. No. 98–598, § 401, 92 Stat. 2549, 2682 (1978). In *Schokbeton,* the franchise agreement provided for a 60–day grace period to cure any default in royalty payments. The franchisee did default and the franchisor notified him that he had 60 days in which to cure. Before the expiration of the 60 days, the franchisee filed a petition under Chapter XI of the Bankruptcy Act. Notwithstanding the bankruptcy filing, the franchisor terminated the franchise after the 60 days expired. The franchisee then petitioned the bankruptcy referee to enjoin the franchisor from granting the exclusive franchise to another licensee. *Schokbeton,* 466 F.2d at 173–74. After the referee granted the injunction, the franchisor appealed.

The Fifth Circuit reversed, holding that under the Bankruptcy Act "a contractual termination provision is unaffected by the filing of a petition in bankruptcy and may be enforced against the trustee or debtor in possession." *Id.* at 176. The court also noted that under the Bankruptcy Act a contract or lease provision which stated that filing a bankruptcy petition automatically terminated the lease was valid and could not be enjoined by a bankruptcy referee. *Id.* This decision, and the rationale behind it, is clearly not applicable under the Bankruptcy Code.

---

**7.** As previously cited cases have illustrated, the lessor may prevent this occurrence by moving the bankruptcy court to force the debtor to as-

sume or reject the unexpired lease before the option period expires.

*Cook United,* 53 B.R. at 345; 11 U.S.C. § 365(e)(1)(B) (1994) (preventing enforcement of any clause in an executory contract or unexpired lease which purports to terminate the agreement if one party files for bankruptcy).

We are also concerned with the leverage landlords would receive if debtors were forced to cure prepetition defaults before deciding whether or not to assume a lease. Bankruptcy Code § 365(b)(1) requires a debtor to cure or provide adequate assurances that it will promptly cure prepetition defaults at the time it assumes or rejects a contract. 11 U.S.C. § 365(b)(1) (1994). If a debtor does not assume a contract or unexpired lease, the existing default becomes an unsecured claim and is paid with no more priority than any other unsecured creditor enjoys under the Code. *E.g., In re Pacific Express, Inc.,* 780 F.2d 1482, 1486 (9th Cir. 1986). A debtor in possession can assume or reject an executory contract or unexpired lease of residential real property at any time before plan confirmation. 11 U.S.C. § 365(d)(2) (1994). Although an unexpired lease of nonresidential real property must be assumed or rejected within 60 days of filing the petition, 11 U.S.C. § 365(d)(4) (1994), debtors are often granted extensions of time well beyond this 60–day period.

Under the dissent's rationale, a lessor could force a debtor to cure prepetition defaults in order to preserve its right to exercise a renewal option. If the lease is ultimately rejected, however, the prepetition default would have been a general unsecured claim. In effect, the lessor is given leverage to squeeze a preference out of the debtor. We do not feel this result is in line with the policy behind the Bankruptcy Code in general or behind § 365 specifically.

The dissent disagrees with this analysis, stating that the lessor's exercise of its "lawfully bargained for rights" in this situation is not unfair "leverage," but merely enforcement of its contract rights. The dissent characterizes our holding as a "balancing act [which] is an improper taking of the lessor's

bargained for contractual rights." This view is at odds with both the plain language and purposes of the Bankruptcy Code, which in various ways nullifies, modifies or stays creditors' lawfully bargained for contract rights. *E.g.,* 11 U.S.C. §§ 362, 365, 522(f), 524, 544, 545 (1994). If the dissent's theory were correct, then any landlord could defeat § 365 by inserting a lease provision that requires a complete cure of any defaults before exercising an option in the lease. Surely the Bankruptcy Code was not intended to allow such circumvention. *E.g.,* 365(e)(1)(B) (1994).

### 2. *Section 108*

The dissent fails to cite a single case in support of its position that a debtor must cure all prepetition defaults before exercising an option to renew which is conditioned upon the debtor not being in default. Instead, the dissent points to § 108(b). Section 108(b) states that if state law or an agreement fixes a certain period in which the debtor may cure any defaults, and the default period has not yet expired at the time of filing bankruptcy, the debtor has until the later of the end of the period contained in the agreement or 60 days after the bankruptcy petition is filed.

We disagree with this analysis, finding more persuasive the reasoning behind the decision in *Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984).[8] In *Moody,* a jobbership contract between the debtor and a creditor provided for a fifteen day cure period after a default. The debtor defaulted, then filed bankruptcy before expiration of the fifteen day cure period. The creditor, referring to § 108(b), argued that the debtor had to cure its default within 60 days or the jobbership contract would terminate. The court disagreed, holding that "section 108(b) does not apply to curing defaults in executory contracts" because "[s]ection 365 specifically governs...." *Id.* at 1215; *accord In re McCallen,* 49 B.R. 948, 952 (Bankr.D.Or.

---

8. Although the *Moody* decision specifically concerned executory contracts, its reasoning is just as applicable to unexpired leases.

1985).[9]

The dissent argues that the rationale behind *Moody* is not applicable to the instant appeal, because "[a]lthough § 365 may extend the time for curing defaults until assumption of the lease, it does not eliminate the contractual necessity of not being in default when attempting to exercise the options to extend the leases." However, the dissent fails to cite any statutory or case authority for this distinction. We think the policy considerations outlined in *Moody* are applicable in the instant appeal:

> This holding is consistent with the policies underlying the different provisions and the Code in general. The purpose behind section 108(b) is to permit the debtor an extension of time for doing certain acts necessary to preserve his rights. It would be anomalous to apply it to restrict debtor's rights.... Applying section 108(b) here would force debtors to decide whether to cure long before they must decide whether to assume or reject the contract and long before they know whether any reorganization plan will be confirmed. Finally, the purpose behind chapter 11 is "to permit successful rehabilitation of debtors" and "to prevent a debtor from going into liquidation." Debtors must be permitted a certain amount of flexibility in determining whether to assume or to reject a contract. Specific provisions of the Code should be interpreted with this goal in mind. To interpret the Code so as to minimize flexibility and rush the debtor into what may be an improvident decision does not further the purposes of the reorganization provisions.

*Moody,* 734 F.2d at 1216 (citation omitted).

### D. *Alternative State law Theory*

■ As discussed above, the bankruptcy court rejected Coleman's argument that the leases had automatically terminated pre- or postpetition because the Debtors were in default at the time they exercised the options to renew. The bankruptcy court then stated that even if it held that the leases had terminated, state anti-forfeiture law would allow the debtors to reinstate the leases. The bankruptcy court cited *In re Waterkist Corp.,* 775 F.2d 1089 (9th Cir.1985), as support. *Waterkist* presents a two-part analysis for determining whether a debtor can reverse the prepetition termination of a lease and thereafter assume the lease in bankruptcy. Under the *Waterkist* analysis, a court first determines whether the lease was terminated prepetition pursuant to the contract under applicable state law and, if so, whether the termination would have been reversed under state anti-forfeiture provisions. The bankruptcy court indicated that under this analysis, the Debtors would probably be entitled to assume the leases even if they had terminated. We decline to address the propriety of this fact-intensive analysis, however, because we have already affirmed the bankruptcy court's decision for the reasons expressed in Part IV, subsection C above.

## V. CONCLUSION

Coleman challenges the chain of assignment between Pickering and Debtors, but fails to meet its burden under *Celotex.* Having failed to raise material issues of fact, Coleman raises the statute of frauds as an issue of law. However, Coleman lacks standing to raise this legal argument because it was not a party to the assignment contract. Finally, § 365(d) permits a debtor to exercise an option to renew an unexpired lease prior to assumption and cure. Accordingly, the order granting summary judgment is **AFFIRMED.**

RUSSELL, Bankruptcy Judge, dissenting:

I respectfully dissent.

---

9. In *Moody,* the Seventh Circuit distinguished the case of *Johnson v. First Nat'l Bank of Montevideo,* 719 F.2d 270 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984), which held that § 108(b), rather than § 362, governed the expiration of a statutory period of redemption of a mortgage. The court in *Moody* explained that § 362 does not specifically apply to redemption periods and therefore there was no direct conflict between those two provisions. However, there is a direct conflict between § 108(b) and § 365 as applied to executory contracts (and unexpired leases), and therefore these two sections "should not [be] appl[ied] ... so as to cause irreconcilable conflict...." *Moody,* 734 F.2d at 1215 n. 15.

Although I agree with the majority that the debtors in possession are proper assignees of the leases, I cannot agree that the leases were properly assumed. I agree with Coleman's argument that the attempt by the debtors in possession to exercise the extension rights for the final five-year option must fail because the debtors in possession were in default both pre- and postpetition.

The issue before us is not whether the debtors in possession can exercise their options to renew the six leases without assuming the leases and curing the defaults.[10] Rather, the issue before us is whether the options could have been exercised without first curing the defaults. If not, then there were no leases for the debtors in possession to later assume.

Paragraph 3 of the leases provides that the lessee could exercise the extension rights:

[B]y giving Lessor at least six (6) months written notice of such extension prior to the expiration of the original or any extended term as the case may be, *provided that Lessee's right to extend is conditioned upon the Lessee not being in default hereunder and is not in default of payments under any of the other leases described on Schedule C attached hereto.* (Emphasis added.)

The debtors in possession filed their bankruptcy cases on May 15, 1990. Under the leases, the first extension of the leases would have expired on November 20, 1992, unless the written notices to renew were given by May 20, 1992. Although the written notices were sent, the leases were in default at that time.

I know of no provision in the Bankruptcy Code which gives a debtor in possession the right to exercise an option without also curing any default as required by the very contract which gives the lessee the right to exercise the option. Although the majority argues that § 365 abrogates an important right of the lessor in the lease, i.e., the right to have all defaults cured when the option is exercised, they point to no specific part of § 365 to achieve this result.

There is nothing in § 365 that extends the time to exercise the option and the fulfillment of any conditions precedent, such as not being in default, at the time of the purported exercise. Since the time to exercise the options expired, the leases were terminated.

It is clear that the notice required to exercise the option was not extended pursuant to § 108(b).[11] Therefore, pursuant to ¶ 3 of the leases, the debtors in possession were required to timely exercise the options. Indeed, the debtors in possession recognized the need to timely exercise the options by attempting to do so. However, a condition precedent for the right to exercise the options was not being in default on the leases. Since the defaults were not cured, there was no timely exercise of the options. Thus, the leases were terminated.

The majority states its holding as follows: We disagree [with the dissent] and for the reasons discussed below hold that a debtor who is a lessee under a lease which conditions renewal upon not being in default may exercise its option to renew without first curing the default or assuming the lease.

Unfortunately for the majority, no other court, at least none of those cited by the majority, has ever stated such a rule of law.

The majority relies on a number of bankruptcy court decisions, mainly, *In re Revco D.S., Inc.*, 111 B.R. 626 (Bankr.N.D.Ohio

---

**10.** However, if this were the issue, I would hold that in order to exercise their options to extend the six leases, the debtors in possession must assume the leases and *perforce* cure the defaults.

**11.** Section 108(b) provides:

(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any

pleading, demand, *notice*, or proof of claim or loss, cure a default, or *perform any other similar act*, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or *perform*, as the case may be, before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 60 days after the order for relief.

11 U.S.C. § 108(b) (emphasis added).

1989), *In re Webster Clothes, Inc.*, 36 B.R. 260 (Bankr.D.Md.1984), *In re Cook United, Inc.*, 53 B.R. 342 (Bankr.N.D.Ohio 1985) and *In re Tirenational Corp.*, 47 B.R. 647 (Bankr.N.D.Ohio 1985).

Upon close scrutiny, those cases represent judges "legislating" a result with no basis under § 365, in order to achieve a result which those courts felt would better serve some bankruptcy purpose. As the majority states: "This policy also balances the contract rights of the landlord, while protecting the debtor's rights to the § 365 period under which to decide whether to assume or reject the lease." In my opinion, the balancing act is an improper taking of the lessor's bargained for contractual rights.

The majority first notes that they "are concerned with the leverage the dissent's position would give to landlords". The majority then disagrees with my dissent as follows:

> Under the dissent's rationale, a lessor could force a debtor to cure prepetition defaults in order to preserve its rights to exercise a renewal option. If the lease is ultimately rejected, however, the prepetition default would have been a general unsecured claim. In effect, the lessor is given leverage to squeeze a preference out of the debtor. We do not feel this result is in line with the policy behind the Bankruptcy Code in general or behind § 365 specifically.

The majority has a very interesting way of looking at a lessor's contractual rights in a pejorative sense of giving "the lessor leverage to squeeze a preference out of the debtor". I suppose it is possible for a court to look at any party's exercise of its lawfully bargained for rights against a debtor in possession as unfair "leverage." However, I choose not to view parties' rights in this light.

Indeed, the court in *Cook United*, stated what I believe is the law:

> Debtor is requesting this Court to rewrite the leases and Section 365 of the Bankruptcy Code, by holding that even though it was in default, Debtor had a right to exercise its option to renew the

leases prior to its assuming said leases and curing the defaults. This Court cannot do so. *The bankruptcy court has no authority to modify or nullify contractual provisions. Matter of Schokbeton Indus., Inc.*, 466 F.2d 171 (5th Cir.1972).

53 B.R. at 345 (emphasis added).

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984), offers no support for the majority's holding. In relevant part, *Moody* merely stands for the proposition that § 108 does not generally apply to curing defaults in executory contracts, but that such time limit is governed by § 365.

*Moody* is of no assistance to the majority's reasoning because the time limit that is in question in the case before us is the period of time in which to timely exercise an option. Although § 365 may extend the time for curing defaults until assumption of the lease, it does not eliminate the contractual necessity of not being in default when attempting to exercise the options to extend the leases.

The facts in *Revco* were very similar to those in the case before us. While in default, the debtor in possession notified the lessor, postpetition, that it was exercising its option to extend the lease. The court held that the debtor in possession could properly exercise the option to extend the lease, without assuming the lease and curing the default, because the lessor failed to request the court to order the debtor in possession to assume or reject the lease. Without any independent analysis, the court based its holding on the following cases: *Cook United, Tirenational,* and *Webster.*

In *Cook United*, the court held that the option to extend the leases could not be exercised without the debtor in possession first assuming the leases and curing the defaults. Approximately one month prior to the date on which the debtor in possession was required to exercise the option under the leases, the lessor filed an application to require the debtor in possession to assume or reject the leases. The debtor in possession failed to assume or reject the leases prior to the expiration of the leases.

The holding of *Cook United* which is relevant to the matter before us was stated as follows:

> Once a request is made by the lessor to assume or reject, federal policy no longer overrides the contract, and the lease terms retain their original effect. Thus once Glimcher filed for an order to assume or reject, Debtor had to assume and cure all defaults before it could exercise the option to renew. This is especially so where the lease provision in question is an option to renew. Such provisions are designed to provide the lessor with enough time to find a new tenant if the lease is not renewed. To allow Debtor to exercise the option without assuming the lease would be a substantial interference with the contractual rights of the lessor, because he would not know if the lessee intended to remain, the very thing for which he bargained. Where the lessor has requested assumption or rejection, Debtor must assume before it may exercise an option to renew. In order for Debtor to reap the benefits of a contract, it must at the same time bear the burdens of that contract. *In re Tirenational Corp.*, 47 B.R. 647 (Bankr. N.D.Ohio 1985).

53 B.R. at 345.

My only disagreement with the above statement by the court in *Cook United* is that I see no requirement in either bankruptcy or non-bankruptcy law that the lessor must first apply to the bankruptcy court to order the debtor in possession to assume or reject the lease before being entitled to the contractual benefits of the lease which the *Cook United* court stated it "... has no authority to modify or nullify ...." *Id.*

The only case authority cited by the court in *Cook United* for the purported rule of law is *Tirenational*, which does not support this conclusion and which offers no support for the majority's position.

*Tirenational* involved two separate chapter 11 cases in which the debtor in possession in the first case was the franchisor and the debtor in possession in the second case was the franchisee. After the filing of the franchisor's case, but before the filing of the franchisee's case, the franchisee was in substantial default on its payments. Therefore, the franchisor notified the franchisee that the franchise agreement was terminated.

The issue before the court was whether the franchisor could exercise its termination rights without first assuming the franchise agreement. If it could, then the agreement was terminated prior to the franchisee's filing its chapter 11 case and consequently would not be property of the franchisee's bankruptcy estate.

The court correctly held that until the agreement was assumed or rejected, it remained in effect and the franchisor/debtor in possession could exercise its termination rights against the franchisee. The case did not involve the exercise of an option to extend and did not involve any purported requirement that a lessor file a motion requiring a lessee to assume or reject the lease before the lessor could exercise its contractual rights.

Therefore, *Tirenational* is not relevant to the question before us, i.e., whether a debtor in possession can exercise an option in violation of the express terms of the lease requiring the lessee not to be in default at the time the option is exercised.

In *Webster*, the debtor in possession filed an application for authority to assume an unexpired lease for retail premises located in a shopping center, including a five-year extension period provided in the lease.

The debtor in possession timely notified the lessor of its intention to extend the lease. The lessor refused to accept the extension because the debtor was in default and had not assumed the lease. As in the case before us, the lease provided that to extend the lease for a five-year period, it must not be in default. The court held that the attempted extension was effective, the lease had not terminated under its own terms and the lease could be assumed.

The court then announced its ruling as follows:

> Having failed to avail itself of the statutory procedure [under § 365(d)(4) ] for securing an earlier assumption or rejection of the lease, Forbes–Cohen [lessor] will not be

heard to complain that Webster [debtor in possession] had not assumed the lease at the time it exercised the Option.

36 B.R. at 264.

Apparently, not completely satisfied with its newly announced rule, the court went on to note that the default was "minor." The court then concluded:

> As a court of equity, this Court is loathe to enforce a forfeiture of the Option on the basis of a minor default. Webster's effective exercise of the Option deprives Forbes–Cohen only of the chance to relet the Premises to another tenant at a higher rent, a windfall. To hold that Webster has not exercised the Option would be to deprive the estate of a valuable asset and frustrate the cure provisions of Section 365.

*Id.* (citation omitted).

Although there is no authority for the court under federal law to excuse even a "minor" default, there may very well have been state anti-forfeiture laws which would allow the court to avoid a forfeiture. Indeed, as discussed below, I would reverse and remand the case before us for the bankruptcy court to make such a determination under state anti-forfeiture law.

It is clear from the record, as the majority concedes, that there were both pre- and post-petition defaults under the leases. The majority also concedes that the determination and the amount of the defaults was not appropriate on a motion for summary judgment.

Under state anti-forfeiture law, however, it may be possible for the debtors in possession to avoid the termination of the leases. Therefore, this matter should be reversed and remanded to the bankruptcy court in order to provide the debtors in possession the opportunity to have the bankruptcy court consider reviving the leases under state anti-forfeiture law.

## CONCLUSION

The failure of the debtors in possession to cure all defaults at the time of their attempted exercise of the options, in violation of the specific requirement in the leases, resulted in the leases being terminated for failure to timely exercise the options. Nevertheless, it may be possible for the debtors in possession to revive the leases pursuant to state anti-forfeiture law.

I would therefore REVERSE the bankruptcy court's granting of the motion for summary judgment by the debtors in possession, and REMAND the matter for the bankruptcy court to consider the possible revival of the leases under state anti-forfeiture law.