127 F.3d 904
 38 Collier Bankr.Cas.2d 1445, 31 Bankr.Ct.Dec. 808,
Bankr. L. Rep. P 77,562,
97 Cal. Daily Op. Serv. 8136,
97 Daily Journal D.A.R. 13,148
 In re: The CIRCLE K CORPORATION; Circle K Convenience
Stores, Inc.; Circle K. Management Company; Lar-Lin, Inc.;
First Circle Properties, Inc.; Utotem, Inc.; Utotem
Markets of Arizona, Inc.; U Totem of Alabama Inc.;
U-Tote'M of Colorado Inc.; U-Tote-M of Miami, Inc.; Tic
Toc Systems, Inc.; Monterre Properties Inc.; Shop & Go,
Inc.; Circle K General, Inc.; Circle K Hawaii, Inc.;
Combined Aviation Co.; Charter Marketing Company
(Connecticut); Mr. B's Oil Co., Inc.; Mr. B's Food Mart,
Inc.; NPI Corporation; Old Colony Petroleum Company, Inc.;
New England Petroleum Distributors, Inc.; and 44th Street
& Camelback Limited Partnership, Debtors.
COLEMAN OIL COMPANY, INC., Appellant,
v.
The CIRCLE K CORPORATION, Appellee.
 No. 96-15200.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 10, 1997.
Decided Oct. 22, 1997.
 
 Carolyn Johnsen, Hebert, Schenk & Johnsen, P.C., Phoenix, AZ, for appellant.
 James L. Rasmussen, Kemp, Smith, Duncan & Hammond, Albuquerque, NM, for appellee.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel; Jones, Myers and Russell, Judges, Presiding. BAP No. AZ 94-01422-JmeR.
 Before: WHITE,* Associate Justice, Retired, CANBY and RYMER, Circuit Judges.
 Opinion by Judge CANBY; Partial Concurrence and Partial Dissent by Judge RYMER.
 CANBY, Circuit Judge:
 
 
 1
 This case presents the question whether a lessee debtor in bankruptcy, prior to deciding whether to accept or reject nonresidential leases, may exercise an option to renew the leases even though the lessee debtor is in default and the leases specify that they may not be renewed if in default.
 
 
 2
 The Coleman Oil Company, as lessor, leased six gasoline stations in New Hampshire and Maine for ten years, with options to the lessee to renew for two additional five-year terms. Each lease permitted renewal only if none of the leases was in default.
 
 
 3
 Two subsidiaries of the Circle K Corporation claimed to have acquired the lessees' interests under the leases by a series of acquisitions and mergers. After one renewal of the leases, disputed here, Circle K and its subsidiaries filed a Chapter 11 petition in bankruptcy. The lessee subsidiaries ("the Debtors") then sought and received an extension of time within which to assume or reject the leases. See 11 U.S.C. § 365(d)(4)(1994). The first five-year extension of the leases was due to expire, however, prior to the time when the Debtors were required to accept or reject the leases. In order to protect their future choice to accept or reject, the Debtors exercised their option to extend the leases for a second five-year term, even though pre-petition defaults in at least some of the leases had not been cured.
 
 
 4
 The paramount question before us is whether the need to preserve the Debtors' rights under 11 U.S.C. § 365 to accept or reject the leases overcomes the leases' requirement that none of the leases be in default at the time of renewal. We conclude, as did the bankruptcy court and the Bankruptcy Appellate Panel ("BAP"), that the leases may be renewed despite the uncured defaults. We also reject other arguments raised by appellants, and accordingly affirm the judgment of the BAP.
 
 I. BACKGROUND
 
 5
 In November 1977, Coleman, as lessor, and Pickering Oil Heat, as lessee, entered into six leases. The leases covered the following gasoline and convenience store locations in Maine and New Hampshire: (1) Kittery; (2) Epping; (3) Exeter; (4) Dover; (5) Portsmouth; and (6) Durham.
 
 
 6
 The leases provided for an initial term of ten years, and gave Pickering the right to renew for two additional five-year terms under certain conditions:
 
 
 7
 Lessee shall have two (2) additional and successive terms of five (5) years each ... by giving the Lessor at least six (6) months written notice of such extension prior to the expiration of the original or any extended term as the case may be, provided that Lessee's right to extend is conditioned upon the Lessee not being in default hereunder and is not in default of payments under any of the other leases ....
 
 
 8
 ER 5 Exh. A at 2 (emphasis added). Thus, for Pickering or its assignees to extend the leases to the maximum period, they were required to exercise the first option by June 1987, and the second by June 1992.
 
 
 9
 The Debtors assert that they acquired Pickering's interest in the leases through a series of corporate mergers and acquisitions. Northeast Petroleum Inc. ("NPI") is the parent corporation of New England Petroleum and Old Colony Petroleum. NPI acquired Pickering's stock in December 1983 and merged with Charter International Oil in December 1989. Circle K acquired Charter in 1988. Circle K thus became the parent of New England and Old Colony. New England claims to be the assignee of the Kittery, Epping, Exeter, and Dover leases. Old Colony claims to be the assignee of the Portsmouth and Durham leases.[1]
 
 
 10
 During all of these transitions, Coleman received and accepted the full lease payments every month for each of the leases.
 
 
 11
 In March 1987, New England notified Coleman by letter that it elected to renew its leases for five years. In May 1987, Old Colony also notified Coleman by letter that it was exercising its renewal option. Coleman did not object to the renewals, and continued to accept the companies' rent payments.
 
 
 12
 New England and Old Colony defaulted under some of the lease provisions. The parties dispute the exact nature and timing of the defaults. It is agreed that New England failed to maintain the Kittery property. Coleman also states that Old Colony failed to pay the property taxes on the Durham and Portsmouth properties.
 
 
 13
 Circle K and its affiliates filed for Chapter 11 bankruptcy protection in May 1990. The Debtors requested, and were granted, extensions of time within which to assume or reject the Coleman leases. See 11 U.S.C. § 365(d)(4).
 
 
 14
 In October 1991, Coleman filed an adversary action in the bankruptcy court, seeking a declaration that the Debtors were merely tenants at will. Coleman argued that the Debtors were not assignees of the leases because the assignments had never been properly executed and violated the statute of frauds. Coleman also argued that, even if the Debtors were assignees, they had failed properly to exercise options to renew the leases, so that the leases expired either in 1987 or during the bankruptcy proceedings in 1992. Coleman also sought relief from the automatic stay so that it could take possession of the properties.
 
 
 15
 In March 1992, New England and Old Colony informed Coleman by letter of their election to extend the leases for another five year term. The Debtors then moved for summary judgment in the adversary action, asserting that: (1) they were the assignees of the leases and thus entitled to renew them; and (2) the renewals were effective even if the pre-petition defaults had not been cured. The bankruptcy court granted the motion.
 
 
 16
 Coleman appealed to the BAP. The BAP affirmed, concluding that: (1) Coleman failed to raise a material issue of fact regarding the Debtors' status as assignees of the leases; (2) Coleman lacked standing to challenge the assignments under the statute of frauds; and (3) the Debtors successfully renewed the leases for both five-year terms even though they were in default at the time of the second extension. Coleman Oil Co. v. Circle K Corp., (In re Circle K ), 190 B.R. 370 (1996).
 
 
 17
 Judge Russell dissented. He agreed with the majority that the Debtors were the assignees of the leases and that Coleman lacked standing to challenge the assignments under the statute of frauds. He disagreed, however, with the majority's conclusions regarding the Debtors' post-petition extensions of the leases. He concluded that the Debtors' attempts to renew the leases for the second time were ineffective under the terms of the leases, because the Debtors were in default. Id. at 378-82.
 
 II. ANALYSIS
 A. Assignment Of The Leases
 
 18
 The first question is whether Coleman raised a triable issue of fact as to whether the Debtors were assignees of the six leases.[2] See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2551-52, 91 L.Ed.2d 265 (1986). The Debtors have relied on a series of corporate mergers and acquisitions to establish their status as assignees. Although the chain of events is somewhat intricate, we conclude that the Debtors adequately established that the leases had been assigned to them.
 
 
 19
 NPI, the parent corporation of New England and Old Colony, became an assignee of the leases by acquiring Pickering, the original lessee, in December 1983. A Plan of Liquidation evidences that transaction, and states that "Pickering will transfer all its assets" to NPI. ER 5 Exh. P. at 1. Charter then merged with NPI in 1989, after Circle K had acquired Charter in 1988. A Stock Purchase Agreement evidences Circle K's acquisition of Charter. ER 5 Exh. N.
 
 
 20
 Circle K thus became the parent corporation of New England and Old Colony. There is a written assignment of the Portsmouth and Durham leases from NPI to Old Colony dated May 1985. ER 5 Exh. B. As to the four New England leases, the Debtors produced an affidavit and a May 1989 letter from New England's counsel to Coleman. ER 7 at 2-3, Exh. 1. The affidavit is of Paul Welch, the president of New England, and he states that New England became the assignee of the four leases in March 1987. ER 7 at 2-3. The May 1989 letter confirms that information. ER 7 Exh. 1. We thus conclude that Coleman's attacks on the "paper trail" lack merit.
 
 
 21
 Coleman argues that it nonetheless has raised an issue of fact because the Debtors' actions have been inconsistent with the supposed assignments. Coleman points to New England's and Old Colony's contemporaneous requests to extend some of the same leases. Coleman also points to an October 1992 retroactive written assignment of four leases to New England. As the Debtors respond, however, any inconsistent or mistaken behavior on their part does not make the actual assignments ineffective. Moreover, we conclude that such minimal evidence of equivocal behavior would be insufficient, in the face of the Debtors' other uncontradicted evidence, for a reasonable jury to find that the assignments had not occurred. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). We thus conclude that Coleman has failed to raise a genuine issue of material fact regarding the assignments. See id. ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment).
 
 
 22
 Coleman finally contends that the assignments are invalid because the Debtors have not produced formal written instruments of transfer. There is, however, a written assignment of the Portsmouth and Durham leases from NPI to Old Colony dated May 1985. ER 5 Exh. B. In any event, the leases do not require that assignments be in writing. The leases give the lessee the right simply to assign, with the condition only that the original lessee remain primarily liable. See ER 7 Exh. B. Coleman's invocation of the statute of frauds is meritless. Coleman is not, merely because it is the lessor, a party to any assignments of the leases. See 37 C.J.S. Statute of Frauds § 220 (1943). The parties to the assignments do not challenge their validity; it would be for them, not Coleman, to raise the statute of frauds as a defense to enforcement of the assignments if they so chose. See id.; see also Restatement (Second) of Contracts § 144 (1982). We conclude, therefore, that the Debtors were properly granted summary judgment on this point.
 
 B. Extension of the Leases
 
 23
 The next question is whether the Debtors successfully extended the leases in 1987 and 1992. The leases placed two conditions on renewal: (1) the Debtors had to give Coleman six months advance written notice of their intent to renew; and (2) the Debtors could not be in default on any lease at the time of renewal. ER 5 Exh. A at 2. Coleman contends that the Debtors failed to meet these conditions for the renewals in 1987 and in 1992.
 
 1. Extension Of The Leases In 1987
 
 24
 With regard to the 1987 renewals, Coleman contends that the Debtors failed to meet both the notice and the default requirements. Coleman argues that the Debtors did not meet the notice requirement because Old Colony and New England gave notice of extensions of leases that they had not yet been assigned. Coleman also asserts that at least the Kittery lease was in default in 1987.
 
 
 25
 We conclude that the extensions in 1987 are no longer open to challenge. Whether there were any defaults and whether there was any imperfection in the way that the notice was given, all parties acted as if the extensions were effective and any objections to them have long since been waived. See, e.g., Oxford Properties & Fin. Ltd. v. Engle, 943 F.2d 1150, 1153-54 (9th Cir.1991). Coleman continually accepted rent from the Debtors and otherwise treated the Debtors as lessees for many years after 1987. Coleman is estopped from asserting now, ten years later, that the leases expired in 1987. See id. The leases thus remained effective for the five-year term from 1987 to 1992.
 
 2. Extension Of The Leases In 1992
 
 26
 With respect to the 1992 post-bankruptcy-petition extension of the leases, Coleman argues that the Debtors' renewals were ineffective because the leases were in default. We agree that there were defaults under at least some of the leases.[3] There was a pre-petition default on the Kittery lease because the Debtors left the property in disrepair. There also may have been some monetary pre-petition defaults on the Durham, Portsmouth, and Epping leases. The exact nature and extent of the defaults is immaterial because, for reasons we will now explain, we conclude that the bankruptcy court had the power to permit the Debtors to extend the leases without first curing the defaults. The Debtors thus preserved their ability later to assume the leases. See 11 U.S.C. § 365(a).
 
 
 27
 The bankruptcy court and the BAP based their rulings on the rationale underlying section 365.[4] As the BAP stated, "[t]he purpose behind § 365 is to balance the state law contract right of the creditor to receive the benefit of his bargain with the federal law equitable right of the debtor to have an opportunity to reorganize." Coleman Oil Co., 190 B.R. at 376; see also City of San Francisco Market Corp. v. Walsh, (In re Moreggia & Sons, Inc.), 852 F.2d 1179, 1185 (9th Cir.1988). Section 365, in conjunction with the automatic stay provision of section 362, accordingly suspends, once the bankruptcy petition is filed, the termination of a lease that is in default; it extends[5] a debtor lessee's opportunity to cure any defaults until the debtor has the chance to decide whether to assume the lease. See 11 U.S.C. §§ 362, 365 (1994); Post v. Sigel & Co., (In re Sigel & Co.), 923 F.2d 142, 144-45 (9th Cir.1991). The lessor will then get the benefit of its bargain upon assumption, when the debtor lessee must cure the defaults. See 11 U.S.C. § 365(b)(1).
 
 
 28
 If the bankruptcy court could not allow a debtor lessee to renew a lease without first curing defaults, section 365's basic purpose would be frustrated. The debtor would be denied the benefit of section 365's "suspension of time" in order to determine whether to assume or reject the lease. See id. § 365(d)(4). For example, if the bankruptcy court could not permit the Debtors to exercise their renewal option without curing their pre-petition defaults, the Debtors' later choice to assume or reject the leases, guaranteed by section 365, becomes flawed. If the Debtors failed to cure the defaults at renewal (as they did in this case), the leases would expire and the Debtors would be wholly unable later to exercise the choice to assume or reject the unexpired leases. On the other hand, if the Debtors cured the defaults in order to preserve their option to assume or reject, and if they later chose to reject, they would have been forced into granting a preference. In the usual case where an unexpired lease is rejected by the choice of the debtor, any pre-petition defaults become unsecured claims against the bankruptcy estate. See e.g., Pacific Express, Inc. v. Teknetron Infoswitch Corp. (In re Pacific Express, Inc.), 780 F.2d 1482, 1486 (9th Cir.1986). If, however, the Debtors have been forced to cure the pre-petition defaults in order to preserve their choice to assume or reject, then a later election to reject leaves the lessor with a preference over other pre-petition general creditors.
 
 
 29
 The practical effect of requiring the Debtors to cure pre-petition defaults in order to extend the leases thus would be to require an early decision whether to assume or reject the leases. But the bankruptcy court here had explicitly extended beyond June 1992 the Debtors' time to decide whether to assume or reject. The bankruptcy court was not compelled to require a course of action that would render its extension of time illusory, thus depriving the Debtors of the opportunity to reorganize without prematurely burdening the estate with unexpired lease obligations.[6] See Willamette Waterfront, Ltd., 875 F.2d at 1384-85.
 
 
 30
 We find persuasive the reasoning in In re Webster, Clothes, Inc., 36 B.R. 260 (D.Md.1984). There, the bankruptcy court implied a power under section 365 to allow a debtor lessee to exercise options. As in the present case, Webster's leases provided for options to extend, but only so long as Webster was not in default. See id. at 262. Webster was in default under the leases, but the court held that Webster nonetheless could extend them. Id. at 262-63. The court concluded that the general purpose behind section 365 supported such a result, noting that the section's goal is "the preservation of the status quo until the debtor-in-possession decides whether to assume or reject." Id. at 263. We recognize that Webster was decided before the 1984 amendments to section 365, at a time when the debtor had no obligation to exercise the choice to assume or reject a lease until confirmation of the plan. The result in Webster accordingly was based in part on the failure of the lessor to move to shorten the time for election. See id. at 264; see also Cook United, Inc. v. Washington Distrib., Inc., 53 B.R. 342, 345 (N.D.Ohio 1985). But the remaining rationale of Webster is applicable here: a future election under section 365 to assume or reject will be rendered largely illusory if pre-petition defaults must be cured in order to keep the lease alive for the election.
 
 
 31
 Coleman argues that the bankruptcy court lacks the power to "re-write" the parties' contract. See, e.g., Shokbeton Indus., Inc. v. Shokbeton Products Corp., (In re Schokbeton Indus.), 466 F.2d 171 (5th Cir.1972). But all kinds of interferences with contractual rights occur in bankruptcy proceedings. Section 365(a) permits a debtor to reject an executory contract or unexpired lease altogether, which wholly contravenes the contract or lease as written. The automatic stay in bankruptcy frequently prevents the enforcement of contracts according to their terms. We have held that a bankruptcy debtor may cure a default and avoid the termination of a contract even if the contract does not allow for cure. Post, 923 F.2d at 144-45. Thus no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365.
 
 
 32
 We therefore affirm the BAP's decision that the Debtors could exercise their final option to renew the leases without first curing the pre-petition defaults. Thus renewed, the leases did not expire in 1992, and the Debtors could later assume them, curing the defaults or giving assurance of prompt cure at that time. See 11 U.S.C. § 365(b)(1)(A).
 
 III. CONCLUSION
 
 33
 The Debtors provided ample evidence to show that they are assignees of the leases, and Coleman has not raised a material issue of fact on that issue. Coleman is estopped from asserting that Circle K's five-year extension of the leases in 1987 was ineffective; Coleman and the Debtors for years acted as if the extension had been properly executed. Finally, to effectuate the objectives of 11 U.S.C. § 365, Circle K could exercise the 1992 post-bankruptcy-petition renewal options even though there were defaults under the leases.
 
 
 34
 The judgment of the BAP is AFFIRMED.
 
 
 35
 RYMER, Circuit Judge, concurring in part and dissenting in part:
 
 
 36
 The path to deciding whether 11 U.S.C. § 365 allows a lessee debtor in bankruptcy to exercise an option to renew despite being in default, contrary to an express condition precedent in the lease, is uncharted. While the majority's view is plausible, I see nothing in § 365 that allows debtors to disregard their leases and renew while in default.
 
 
 37
 Because exercising the option to renew was conditioned on not being in default on the leases, and the leases were in default at the time the debtors tried to exercise the option, the right to renew was lost. Section 365 does not extend the time to exercise the option or to meet conditions precedent. Nor does § 365 give the debtor the right to opt to renew a contract that is in default when the contract by its terms requires that a default first be cured.
 
 
 38
 To hold otherwise rewrites the lease and, as I read it, § 365. Therefore, for the reasons given by Bankruptcy Judge Russell in his BAP dissent, Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 190 B.R. 370, 378-82 (1995) (Russell, B.J., dissenting), I would reverse.
 
 
 39
 Although I agree that Coleman's arguments about the chain of title and the statute of frauds fail, there are disputes of fact about who was in default and where. I would leave these issues, as well as state law forfeiture issues, to the bankruptcy court on remand.
 
 
 
 *
 The Honorable Byron R. White, Retired Associate Justice of the United States Supreme Court, sitting by designation
 
 
 [1]
 Under the Chapter 11 Plan of Reorganization, Old Colony and New England merged into the Circle K Corporation. Because that merger occurred after the final extension of the leases, we ignore it for purposes of this opinion
 
 
 [2]
 We review de novo the BAP's decisions. Alsberg v. Robertson (In re Alsberg), 68 F.3d 312, 314 (9th Cir.1995). We independently review bankruptcy court rulings on appeal from the BAP. Finalco, Inc. v. Roosevelt, (In re Roosevelt), 87 F.3d 311, 314 (9th Cir.1996)
 
 
 [3]
 Because we conclude that the 1992 renewals were effective even though there were defaults, we need not resolve the issue of the enforceability in bankruptcy of the leases' cross-default provisions, under which a default in any lease prevents renewal of all of them
 
 
 [4]
 The curing of defaults in an executory contract or unexpired lease is governed by section 365, not by the more restrictive extension-of-time provisions of section 108(b). See Moody v. Amoco Oil Co., 734 F.2d 1200, 1215-16 (7th Cir.1984). We agree with the majority of the BAP that section 365 also encompasses the curing of defaults prior to the exercise of an option to renew. See Coleman Oil Co., 190 B.R. at 377-78. On this appeal, neither party has contended that section 108(b) governs
 
 
 [5]
 The "extension" minimally is 60 days from the date of the order for relief. See 11 U.S.C. § 365(d)(4). But the bankruptcy court, as in this case, often grants the debtor's request to extend that period. See id.; see, e.g., Willamette Waterfront, Ltd. v. Victoria Station, Inc., (In re Victoria Station Inc.), 875 F.2d 1380, 1384-85 (9th Cir.1989)
 
 
 [6]
 Of course, the Debtors were required to perform obligations of the leases arising after the order for relief and before assumption of the leases. See 11 U.S.C. § 365(d)(3). The only post-petition default established here was less than $200 with regard to one property. The amount was tendered when notice of the default was given to the Debtors. The bankruptcy court characterized this default as de minimis and we agree. In these circumstances, the BAP did not err in concluding that, in order to preserve the choice under section 365 to assume or reject the leases, cure of this default, too, was not required for exercise of the option to renew