**In re AMES DEPARTMENT STORES, INC., et al., Debtors.**

**Capital Commercial Properties, Inc., and Eden Center, Inc., Plaintiffs,**

v.

**Ames Realty II, Inc., and Ames Department Stores, Inc., et al., Defendants.**

**Bankruptcy No. 01–42217(REG). Adversary No. 02–8048.**

United States Bankruptcy Court, S.D. New York.

Feb. 5, 2003.

Piper Rudnick LLP by Donald E. Sharpe, Mark J. Friedman, Baltimore, MD, for Plaintiffs Capital Commercial Properties, Inc., and Eden Center, Inc.

Patton Boggs, LLP by Mitchell R. Berger, Benjamin G. Chew, Washington, DC, for Defendants Ames Realty II, Inc., and Ames Department Stores, Inc.

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the jointly administered chapter 11 cases of debtors Ames Department Stores, Inc. ("Ames Department Stores"), and Ames Realty II, Inc. ("Ames Realty II," and together with Ames Department Stores, the "Ames Defendants"), brought by landlord-plaintiffs Capital Commercial Properties, Inc. ("Capital Commercial Properties") and Eden Center, Inc. ("Eden Center," and together with Capital Commercial Properties, "Landlord")[1] against tenant-defendant Ames Realty II and its parent Ames Department Stores, the Ames Defendants move for summary judgment in their favor. Summary judgment in the Ames Defendants' favor is granted, for the reasons set forth below.[2]

The Landlord seeks a declaration that its tenant, Ames Realty II, did not validly exercise contract options (or at least the most recent of them) to extend the term of the lease relating to Ames Store # 2571, in Falls Church, Virginia (the "Falls Church Store"). While it is undisputed that the Landlord received written, timely, notices for exercise of the renewal options, the Landlord contends that (while they were written by an officer who was an officer of both Ames Department Stores and Ames Realty II) the notices of option exercise were defective because they were written on the letterhead of Ames Realty II's parent Ames Department Stores, and failed expressly to say that it was Ames Realty II that was exercising the option.

The Landlord contends that as a consequence of this defect or alleged defect (which followed the exercise of the renewal option in a like manner, five years earlier, which was never objected to, and after which the validity of the earlier lease extension was jointly acknowledged), the exercise of the option was a nullity, and Ames Realty II forfeited its rights to continued occupancy of the Falls Church Store. The Ames Defendants dispute this

1. This adversary proceeding was originally one of four similar actions filed in state court, two in the courts of Virginia and two in the courts of Maryland, with respect to four stores, two of each in Virginia and Maryland. After the denial by this Court of the Landlord's motion for relief from the stay to prosecute them, and as a result of comments by the Court in connection with that determination, all of those actions were removed by the Ames Defendants to the federal district courts in their respective districts, transferred to the Southern District of New York, and ultimately referred by the district court to this Court. The other three actions became moot, by reason of the Debtors' rejections of two of the leases, and a settlement with respect to the third.

2. At the conclusion of oral argument, this Court granted the Ames Defendants' motion, with a very modest description of the Court's reasons; this decision confirms and amplifies upon the reasons underlying the Court's determination.

assertion, and contend that they are entitled to judgment as a matter of law, based on traditional contract principles of offer-and-acceptance; facts relating to the parties dealings which are said to establish estoppel, waiver or ratification as matter of law; and principles of law disfavoring the forfeiture of leases.

Because the Court determines that the relevant contractual issues are governed by the objective meaning of the words used by the parties and the undisputed facts with respect to their conduct, the Court concludes that the Ames Defendants have met the high burden for showing that they are entitled to judgment in their favor as a matter of law, and summary judgment in their favor must be granted.

*Facts*

After the parties' exchange of their respective submissions with respect to material facts said not to be in dispute and opposition thereto,[3] and review of the relevant documents, the Court believes that the following facts are not in dispute.

Back in 1963, predecessors to Landlord and Ames Realty II—Capital Properties, Inc. ("Capital Properties"), and Zayre of Virginia, Inc. ("Zayre–Virginia"), respectively—entered into a lease (the "Lease") with respect to the Falls Church Store.[4] The Lease as then drafted would terminate on July 31, 1986,[5] but provided for two options on the part of the tenant to extend it.[6] With respect to the tenant's right to extend, the Lease provided, in its Section 4(B), in relevant part:

Tenant shall have the right, at its election, to extend the original term of this lease for an additional period of ten (10) years commencing upon the expiration of the original term, provided that Tenant shall give Landlord notice of the exercise of its election at least six (6) months prior to the expiration of the original term. Tenant shall have the right, at its election, to extend the original term as previously extended for one (1) additional period of ten (10) years commencing upon the expiration of the original term as previously extended provided that Tenant shall give Landlord notice of the exercise of its election at least six (6) months prior to the expiration of the original term as previously extended. . . . It is expressly understood that the provisions of this Section (B) do not permit Tenant to extend the term of this lease beyond July 31, 2006.

(Lease § 4(B)).

The Lease set forth requirements for the exercise of the options. Its Section 4(B) required notice of the exercise at least six months prior to the expiration of the Lease's term. Additionally, Section 25 of the lease set forth requirements for notice under the Lease; it provided that notice "shall be in writing and shall be given by mailing the same by certified mail or registered mail, return receipt requested, postage prepaid, and except as may otherwise be provided in this lease, any such notice or other communication shall be deemed given when mailed as in this article provided." [7]

---

3. *See* Local Bankruptcy Rule 7056–1.

4. *See* Lease, attached to Landlord's Complaint, at 1.

5. *See* Lease § 4(A).

6. *See* Lease § 4(B).

7. The Lease also had a "Waivers" provision, discussed below. It provided, in relevant part:
 Failure of either party to complain of any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder.

In 1969, Zayre–Virginia assigned its interest as tenant under the lease to Zayre Leasing Corp. ("Zayre Leasing"), and in 1970, Zayre Leasing and Capital Properties executed an amendment to the Lease (the "1970 Amendment").[8] Under the 1970 Amendment, Zayre Leasing (there referred to as "Leasing") exercised the option to renew that had been provided in the Lease's Section 4(B) as originally drafted, thereby extending the lease term for the additional 10–year period from 1986 to 1996. Zayre Leasing and Capital Properties further agreed to add, after the original Section 4(B)'s second sentence:

> Tenant shall have the right, at its election, to extend the original term as previously extended pursuant to the provisions of the second sentence of this Section (B) for four (4) additional periods of five (5) years each, each commencing upon the expiration of the original term as previously extended; provided that Tenant shall give Landlord notice of the exercise of its election at least six (6) months prior to the expiration of the original term as previously extended.

(1970 Amendment § 3(a)).

The 1970 Amendment also deleted the last line of Section 4(B) of the Lease as originally drafted in 1963, which had previously provided: "It is expressly understood that the provisions of this Section (B) do not permit Tenant to extend the term of this lease beyond July 31, 2006."[9]

Though the record does not reveal exactly when or how it happened, it is apparently undisputed that sometime before 1992, Zayre Leasing became a subsidiary or affiliate of Ames Department Stores, which operated its store #2571 at the location of the Falls Church Store. Likewise, though the record is unclear as to when or how it happened, it appears that at some point in time before 1992, Capital Properties became Capital Commercial Properties.[10]

On April 23, 1990, Ames Department Stores, Inc., sought protection under the Bankruptcy Code in an earlier case under chapter 11, reorganizing and emerging from bankruptcy in late 1992.[11] To facilitate its emergence, on or about December 28, 1992, Ames Department Stores and a large number of other tenants of record executed an Omnibus Assignment and Assumption Agreement (the "Omnibus Assignment") assigning their interests in their respective leases to Ames Realty II. The Omnibus Assignment (which was executed on behalf of each assignor, and the assignee Ames Realty II, by a single person, one Frank J. Horacek, identified as a Vice President of each entity) had a proviso, however, stating that each assignor would remain liable, as a primary obligor, for the prompt performance and observance of the covenants in each lease.

The reasons for the Omnibus Assignment were set forth in a letter sent by Mr. Horacek, dated November 17, 1992.[12] Mr.

---

Lease § 22.

**8.** Lease Amendment D.

**9.** Lease § 3(b).

**10.** On May 19, 1998, plaintiff Capital Commercial Properties assigned the Lease to plaintiff Eden Center. (Ebenstein Aff. ¶ 5). That fact does not appear to be material to this Motion.

**11.** The earlier Ames chapter 11 cases were before Judges Goodman (of Maine, sitting by designation) and Garrity.

**12.** Though neither side has raised the point, the Court has considered this letter solely for the fact that the information therein was conveyed to the Landlord, a matter admitted by the Landlord, (*see* Ebenstein Decl. ¶ 9), and not for the truth of the matter asserted.

Horacek's letter was sent to Capital Commercial Properties' Norman Ebenstein, who at all relevant times dealt with the Ames Defendants and their predecessors with respect to the Lease, starting in 1963 (when Mr. Ebenstein signed the Lease on behalf of the Landlord, and executed a personal guaranty of the Landlord's obligations under a related agreement) [13] through May 2001, when Mr. Ebenstein sought to terminate the Lease and renegotiate it.[14] In that letter, which made reference to three Ames stores, including the Falls Church Store, Store # 2571, Mr. Horacek stated, among other things:

> [W]e can only consummate the Plan [of reorganization] if we enter into a credit agreement with Citibank as agent for a new bank group. This credit agreement will require us to satisfy certain conditions, including ... securing our leasehold interest by the bank in the form of a leasehold mortgage at certain stores. This leasehold mortgage would be part of a security package held by the bank group after the Ames reorganization.
>
> Please note that the leasehold mortgage to be placed at the above referenced store would not be a lien on your ownership of the property, but only a lien upon our existing leasehold interest. It would not, in any way, diminish our obligations to you under our lease. Concurrently, the reorganization will streamline the Ames corporate structure, so that *all of the Ames leases will be held by an existing subsidiary, Ames Realty II, Inc., which will become the tenant by merger or assignment where it is not already the tenant.* Nevertheless, you will continue to receive your rent payments from the parent company, Ames Department Stores, Inc.

(Ltr. of Nov. 17, 1992, Complaint Exh. B) (emphasis added).

The Lease as previously extended under the 1970 Amendment would expire on July 31, 1996. By letter dated December 5, 1995 (the "December 1995 Exercise Letter"), on letterhead with the logo "Ames" and, in typeface beside it, "Ames Department Stores, Inc.," John Hlis (who was employed by Ames Department Stores, Inc., as Vice President of Real Estate and who was also Vice President of Ames Realty II) wrote to the Landlord, to the attention of Mr. Ebenstein, advising of the election to extend the term of the Lease. The letter stated, in relevant part:

> Re: Ames Store # 2571
>
> Falls Church VA
>
> Dear Mr. Ebenstein:
>
> We hereby exercise our next five-year option to extend our lease at the above-referenced location.
>
> This five-year option shall commence on August 1, 1996 and continue through July 31, 2001. Three five-year renewal options remain available to us.

(Ltr. of Dec. 5, 1995, Complaint Exh. C).

The December 1995 Exercise Letter was sent by certified mail, return receipt requested. It was signed "John J. Hlis, Vice President, Real Estate." [15]

On February 28, 1998, Landlord and Ames Realty II entered into another amendment to the Lease (the "1998 Amendment"), providing for a number of matters relating, for the most part, to modifications in the shopping center in

---

13. *See* Lease at 48; Unnumbered acknowledgments pages, Supplement to Leases, dated Aug. 13, 1963.

14. *See* Ebenstein Aff. Exh. 1–F.

15. Mr. Hlis sent two additional letters about two weeks later, on December 20, 1995, with substance, so far as the Court can discern, identical to the December 1995 Exercise Letter.

which the Falls Church Store was located. As relevant here, the 1998 Amendment provided:

> 1. Reference is made to Lease dated July 26, 1963 between CAPITAL COMMERCIAL PROPERTIES, INC., (formerly called Capital Properties, Inc.), a Delaware corporation, as "Landlord", and Zayre of Virginia, Inc., a Delaware corporation, as tenant, of certain premises ... in Landlord's Shopping Center ... as the same has been heretofore amended *and extended* (the "Lease").... All of the tenant's right, title and interest in the Lease is now held by Ames Realty II, Inc., a Delaware corporation (hereinafter called "Tenant").
>
> ...
>
> 4. Except as hereby amended, *the Lease shall remain in full force and effect as originally written.* The agreements of the parties herein shall be binding upon and enure to the benefit of their respective successors and assigns.

(1998 Amendment §§ 1, 4) (block caps in original; emphasis by italics added). The 1998 Amendment was executed by Mr. Hlis, as a "Vice President" of Ames Realty II. *Id.* At this time, Ames Department Stores executed a separate guaranty of the Lease;[16] the guaranty likewise identified Ames Realty II as the tenant of record.[17]

Shortly before the execution of the 1998 Amendment, Mr. Ebenstein, identifying himself as Chairman of the Board of Capital Commercial Properties (and on letterhead that identified himself as President), wrote a letter to Mr. Hlis, addressed to Mr. Hlis in his capacity as "Vice President—Real Estate, Ames Department Stores, Inc." Mr. Ebenstein then wrote, in relevant part:

> I am preparing the Lease Modification Agreements (at last) to conform, I believe, to exactly what you and I agreed upon. In Paragraph 1 in all of the Modification Agreements there is a blank space for the exact corporate name of the tenant in possession. Because of the possibility of some in-house corporate restructuring, rather than relying on my records, I would appreciate it if you would fax me a note indicating the correct corporate name for each of the three sites involved.

(Ltr. of Nov. 28, 1997, Ebenstein Aff. Exh. 1–B).

Mr. Hlis faxed a response a few days later, stating, "[t]he correct corporate name for all three locations is 'Ames Realty II, Inc.' "[18]

The Lease as previously extended pursuant to the December 1995 Exercise Letter (assuming that the extension was valid) would expire on July 31, 2001. By letter dated December 21, 2000 (the "December 2000 Exercise Letter"), once more on letterhead with the logo "Ames" and, in typeface beside it, "Ames Department Stores, Inc.," John Hlis (who continued to be employed by Ames Department Stores, Inc., as Vice President of Real Estate and who was also Vice President of Ames Realty II, and who had executed the 1998 Amendment in the latter capacity), wrote once again to Mr. Ebenstein, notifying Capital Commercial Capital Properties of a further exercise of the options to extend the Lease. The December 2000 Exercise Letter stated, in relevant part:

> Re: Ames Store # 2571
>
> Falls Church VA

---

**16.** *See* Ebenstein Aff. ¶ 13, Ebenstein Aff. Exh. 1–E.

**17.** *See* Ebenstein Aff. Exh. 1–E.

**18.** Ltr. of Dec. 4, 1997, Ebenstein Aff. Exh. 1–C.

Dear Mr. Ebenstein:

We hereby exercise our next five-year option to extend our lease at the above-referenced location.

The five-year option shall commence on August 1, 2001 and continues through July 31, 2006. Two five-year renewal options remain available to us.

(December 2000 Exercise Letter, Complaint Exh. D).

As in 1995, the December 2000 Exercise Letter was sent by certified mail, return receipt requested, and was signed "John J. Hlis, Vice President, Real Estate." The December 2000 Exercise Letter was sent approximately 41 days—almost six weeks—before the deadline for the exercise of the renewal option.

On May 1, 2001, more than four months thereafter (and three months after the deadline for exercise of the option), Mr. Ebenstein, sent a letter, via fax and certified mail, return receipt requested, addressed "To Whom It May Concern," to Ames Department Stores, Inc., and Ames Realty II, Inc. Mr. Ebenstein wrote:

We have recently had occasion to review our leases and correspondence dealing with all our Ames stores and more particularly Shirley Highway (your store # 2570).

A review of our documents indicates that in 1992, Ames Department Stores, Inc. assigned the Shirley Highway lease and other leases with our company, to Ames Realty II, Inc.

Thereafter, Mr. Hlis, as Vice President for Ames Department Stores, Inc., attempted to exercise options to extend the leases. Given the fact that Ames

Department Stores, Inc. had no residual rights, and no options to extend were ever exercised by Ames Realty II, Inc., for any stores. [sic] Ames Realty II has been occupying the stores as a holdover tenant since the expiration of the last term of each lease.

Given our longstanding relationship, I am taking this opportunity to write to you and advise you as to the status of these premises, rather than immediately exercising our rights under the leases and because of a 40–year relationship with Ames and its predecessor we do not wish to cause Ames a multitude of problems. It may well be that landlords in other Ames locations may not yet have recognized the deficiencies. However, for our purposes, it is essential that a meeting be immediately arranged to either enter into new leases, or to coordinate vacation of the subject stores.

(Ltr. of May 1, 2001, Ebenstein Aff. Exh. 1–E).[19]

David Lissy, Senior Vice President and General Counsel of Ames Department Stores, responded to Mr. Ebenstein, by fax and certified mail, the following day. He replied that:

John Hlis was at all times a Vice President of Ames Realty II, Inc., and property acted on behalf of that entity. All of the option extensions were validly exercised.

(Letter of May 2, 2001, Cmplt. Exh. F).

During the period of time from the exercise of the option in a like manner in December 1995 (and even after identification of Ames Realty II as tenant of record in December 1997), through May 1, 2001, the Landlord accepted the Ames Defen-

---

19. Apparently several (and presumably similar) letters of that date were sent to the Ames Defendants. (See Lissy Ltr. of May 2, 2001, Cmplt. Exh. F.) ("Your various letters of May 1, 2001 have been referred to my attention").

The letter that was submitted as part of the record on this Motion related to store # 2570, rather than # 2571. So far as the Court can tell, that distinction, if it is one, is immaterial.

dants' tenancy without protest. During this period, the Landlord accepted without protest 66 payments of monthly rent.[20] It was not until May 1, 2001 that the Landlord first raised the issues that are the subject of this Motion. The Landlord did not begin accepting rent with a reservation of rights until after it filed litigation in May 2001.[21]

*Discussion*

**I.**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56 (made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056). The moving party bears the initial burden of showing that the undisputed facts entitle the movant to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995); *Ferrostaal, Inc. v. Union Pacific R. Co.,* 109 F.Supp.2d 146, 148 (S.D.N.Y.2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact ..."). Then, if the movant carries this initial burden, the nonmoving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *See also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.),* 265 B.R. 524, 529 (Bankr. S.D.N.Y.2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials").

In this connection, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (holding that summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Limited v. British Airways PLC,* 257 F.3d 256, 262 (2d Cir.2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) ("We ... constru[e] the evidence in the light most favorable to the non-moving party"). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**II.**

■ Both sides agree that their rights in this dispute are governed by the law of

---

**20.** As noted below, the Court does not regard the Landlord's acceptance of rent from *Ames Department Stores* as significant. It rather regards as significant the Landlord's acceptance of rent for the Falls Church Store for the 5–1/2 years (or 66 months) after which it contends the option to extend was invalidly exercised in December 1995 (and then again in December 2000), and the Landlord's failure to protest until May 2001, after it had

been advised that Ames Realty II was its tenant of record in November 1992, and was advised again that "the exact corporate name of the tenant in possession" was Ames Realty II in December 1997. (*See* Ebenstein Aff. Exhs. 1–B, 1–C).

**21.** *See* Ames Defendants' Rule 7056–1 Submission at ¶ ¶ 15–18.

Virginia.[22] But we here have the oddity that while there appears to be no "wrong letterhead" case decided by the Virginia courts or under Virginia law, an astoundingly similar case has been decided under the law of Maryland, by Maryland's highest court, *see Beckenheimer's, Inc. v. Alameda Associates, Ltd.*, 327 Md. 536, 611 A.2d 105 (1992), whose law this Court does not regard as different in any material respect. There the Maryland Court of Appeals unanimously rejected the same argument the Landlord makes here—an argument that the Ames Defendants not unfairly characterize as "hyper-technical"[23]—that a tenant's wholly unambiguous option exercise notices were defective because they were written on letterhead of the tenant's corporate parent.

In *Beckenheimer's*, a subtenant (Beckenheimer's) exercised its option to renew its sublease, sending its sublessor (Acme) a timely notice of renewal. But the subtenant's renewal letter was written on the letterhead of its corporate parent, B. Green & Co., and signed by one Martin Braun, "head of real estate for B. Green and all of its subsidiaries." 611 A.2d at 107. The sublessor Acme sought to void the resulting sublease extension, seeking a judicial declaration that the renewal notice written on the parent's letterhead was not sufficient to exercise the subsidiary's option to renew.

The *Beckenheimer's* court rejected that argument, and reversed an award of summary judgment in favor of the sublessor there. It reasoned that:

> The exercise of the option to renew should be viewed much like the formation of a contract. The option is a continuing offer by [the sublessor] Acme

which may be accepted by complying with the conditions of the offer.

*Id.* at 109–110. The court concluded, accordingly, that the relevant issue was whether the subtenant had expressed the intent to renew by sending out the notice, and that the determination necessarily had to be based on objective criteria. It stated, in this connection, with an analysis plainly applicable here:

> The *objective, reasonable interpretation* of the April 26 letter is that it is an acceptance by the legal owner of the Sublease.

> On the other hand, to construe the April 26 letter as written on behalf of B. Green, because of the letterhead, as Alameda contends, is an unreasonable interpretation. *It ignores the clear manifestation of intent to accept the offer to renew.* The argument seeks to attribute the renewal to an entity which is not a party to the Sublease and is not the optionee.

> Because the *reasonable, objective interpretation* of the April 26 letter is that Beckenheimer's, the sublessee, was exercising the option, it is irrelevant whether the author of the April 26 letter harbored, at the time it was written, a mistaken subjective intent as to the ownership of the sublessee's interest. *A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean.*

*Id.* at 110 (emphasis added).

▮ The Ames Defendants contend that under the law of Virginia, the question of whether the tenant validly extended the lease term is likewise determined by objective criteria.[24] The Landlord does not

---

**22.** *See* Ames Defendants' Br. at 4; Landlord's Br. at 7.

**23.** *See* Ames Defendants Answering Br. at 5.

**24.** *See* Ames Defendants' Br. at 5.

really dispute this, and the Court agrees. Virginia courts, like those in Maryland, hold that a party's intention to enter into a contract is determined by objective criteria, under a "reasonable person" standard. As the Virginia Supreme Court held in *Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516, 521 (1954):

> The law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. If his words and acts, judged by a reasonable standard, manifest an intention to agree, it is immaterial what may be the real but unexpressed state of his mind.

*Id.,* 84 S.E.2d at 522; *accord Wells v. Weston,* 229 Va. 72, 326 S.E.2d 672, 676 (1985) ("In evaluating a party's intent, however, we must examine his outward expression rather than his secret, unexpressed intention.").

Here, each of the December 1995 Exercise Letter and December 2000 Exercise Letter [25] unequivocally and unmistakably evidenced the tenant's intention to renew the Falls Church Store Lease, and objective analysis leaves no room for any contrary conclusion.[26] The letters were written by Tenant's Vice-president, John Hlis. While he had the title "Vice-president, Real Estate" at Ames Department Stores, he was also a Vice–President of Ames Realty II, and there has been no hint that he lacked either actual or apparent authority to say what he did. In each of December 1995 and December 2000, Mr. Hlis sent written, timely letters to the Landlord, by certified mail, return receipt requested. Each of the letters unequivocally gave notice of the exercise of the option to extend the lease. On their "Re" lines, they identified the city, state and store number of the Falls Church Store, and specified the dates on which the option periods would begin and end. They even confirmed the number of available renewal option opportunities that would remain after the option exercise. The communications are susceptible to only one interpretation.

Nor is there any evidence that they were understood any other way. While the Court believes that the objective meaning

25. At this juncture, only the second of the two allegedly defective exercises of the option to renew appears to be at issue before the Court, as the Landlord's objection, as a practical matter, now covers only the time period going forward. But it is noteworthy that the parties went all the way through a lease extension period of five years (1996–2001) following an exercise of the option by the Ames Defendants in the same, allegedly defective manner, after the Landlord had been advised that "the exact corporate name" of the tenant in possession was Ames Realty II, in November 1992 and again in December 1997. It is even more noteworthy that before the Landlord had the apparent motivation to dispute the validity of the extension, it executed an express acknowledgement of the validity of the previous extension in February 1998, even after the "exact corporate name" of its tenant was called to its attention, and the defects, if any, of the December 1995 Exercise Letter were obvious. This is relevant, in the Court's view, not just because it exemplifies how, under any objective reading of the words the Ames Defendants used, their actions were understood to be an exercise of the option, but also because it gives rise to an estoppel, as discussed below.

26. All or substantially all of the indicia considered by the *Beckenheimer's* court appear here as well. There the court noted:

> It [the renewal letter] is addressed to the sublessor. Acme knows that the sublessee is Beckenheimer's. And, indeed, an Acme representative pointed out that Beckenheimer's was the sublessee in a discussion with a representative of Beckenheimer's had after receipt of the April 26 letter and prior to the mailing by Beckenheimer's of its May 4 letter. The objective, reasonable interpretation of the April 26 letter is that it is an acceptance by the legal owner of the Sublease.

*Beckenheimer's,* 611 A.2d at 110.

of the Ames Defendants' communications is determinative, rather than the subjective understanding of the recipient Landlord, the Court nevertheless notes the total absence of evidence or argument that the Landlord ever had a contrary understanding. In 1998, having recognized that Mr. Hlis had acted for the Falls Church Store tenant, but being unaware of "the exact corporate name of the tenant in possession," [27] Mr. Ebenstein asked Mr. Hlis. After being told that it was Ames Realty

II, Mr. Ebenstein did not then say, in words or substance, "then the lease was never extended." Rather, he executed a document expressly acknowledging that the lease had been extended.[28]

Against this, the Landlord has provided nothing sufficient to defeat summary judgment.[29] It has not quarreled with the Ames Defendants' point that objective indicia of intent control, nor has it suggested anything to show a basis for a contrary understanding of intent.[30] The Landlord's

---

**27.** Ltr. of Nov. 28, 1997, Ebenstein Aff. Exh. 1–B.

**28.** This case is thus stronger than *Beckenheimer's*, given the express ratification of the validity of the earlier lease renewal after an earlier renewal in the same, allegedly defective, manner, and it is stronger than *Beckenheimer's* in another respect as well. Here the lease expressly defined "Tenant" in a broad manner that included "legal representatives" (Lease § 19), a term that by its plain meaning would include authorized agents. Execution by an agent of the tenant was expressly authorized. In a case like this one, where the agent's apparent and actual authority to execute the renewal are unquestioned, and the objective words used are so clear, there is nothing left to try, and summary judgment must be granted.

**29.** Counsel for the Landlord noted, in both its brief, (*see* Landlord's Br. at 9 n. 5), and oral argument, that in *Beckenheimer's*, the Maryland Court had remanded after its reversal of the grant of summary judgment in the sublessor's favor and had not simply granted summary judgment in the sublessee's favor, and that here the Ames Defendants actually seek summary judgment in their favor. These observations are correct, but ultimately not dispositive. In the absence of any articulation by the *Beckenheimer's* court of its reason for taking such action, there are too many possible reasons for such action (including, e.g., the several matters of dispute there between the parties, matters of appellate jurisprudence, and/or failure to focus on the matter) to draw definitive conclusions therefrom. The legal principles themselves, at least when applied to the facts here (where there has been no factual basis presented to warrant a

finding that the requisite objectively understood intention to exercise the option was lacking), warrant summary judgment for the tenant in this case.

> In this connection, the Court notes that the Landlord has not filed a Rule 56(f) affidavit, or otherwise identified for this Court (nor has the Court's independent examination revealed), anything that might be obtained in discovery, especially after the discovery opportunities to date, that could negate the conclusion dictated by the language used by their parties in their communications, and their course of dealings up to this point. Likewise, the Landlord's supposed disputed issues of fact, to the extent they do not relate to irrelevant matter, are really no more than disputes as to the legal consequences of the undisputed facts, and/or ultimate legal conclusions to be drawn.

**30.** At one point, the Landlord notes, properly, that "the *Beckenheimer's* court emphasized that the inquiry into a party's 'intention' must be from the perspective of the *other* party, which in this case is would be Capital, not Ames Realty." (Landlord's Br. at 7–8) (emphasis in original). But the Landlord fails then to show any basis upon which it could reasonably have concluded that the option had not been exercised, nor that it ever had (objectively or subjectively) construed what its tenant had said in that fashion. To the contrary, even after disclosure of the true tenant of record, the Landlord acknowledged the validity of the lease renewal.

> The Landlord asserts later in its brief that here "there is no evidence to show that Plaintiffs did not conclude that *Ames Realty II* was renewing its lease by the Hlis letters," citing (with a "see, e.g.,") the May 1,

only response has been its observation (with which the Court does not disagree) that under Virginia law, the right to exercise an option belongs to the tenant of record,[31] and its points (with which the Court once more does not disagree) that Ames Department Stores had previously assigned its leasehold interest to Ames Realty II, and that the "correct corporate name" of the "tenant in possession" was Ames Realty II. But the Ames Defendants have not asserted, and the Court has not held, that the right to exercise the option ever belonged to anyone other than Ames Realty II, and the point that Ames Department Stores was once the tenant is not relevant. The issue is rather whether, considering objective indicia, a reasonable entity in the place of the Landlord would have understood that the option was being exercised by the Landlord's tenant. Here the objective words could lead to only one conclusion—which indeed conformed to Mr. Ebenstein's understanding, as a subjective matter, as he confirmed when he executed the 1998 Amendment. There is nothing left to try.

### III.

The Ames Defendants also seek summary judgment based on contentions of estoppel by conduct. For this reason too, their motion must be granted.

▮▮▮ Under the law of Virginia, estoppel by conduct occurs where one party

"caused the other party to occupy a more disadvantageous position than that which he would have occupied except for that conduct." *Stanley's Cafeteria, Inc. v. Abramson,* 226 Va. 68, 306 S.E.2d 870, 873 (1983). The Court believes such has been shown here, as a matter of law. Two matters, in particular, cause this Court to find an estoppel here.

The first arises from the Landlord's acknowledgement, in February 1998—after being told (once again, after being notified similarly in November 1992) that *Ames Realty II* was "the exact corporate name of the tenant in possession," and then knowing that the 1995 exercise of option had been done in the same manner (a manner now contended to be ineffective)—that the lease had been validly extended, in connection with the 1998 Modification Agreement entered into at that time. The 1998 Modification Agreement referred to the Original 1963 lease, "as the same has been heretofore amended *and extended.*" (1998 Modification Agreement ¶ 1) (emphasis added). It further stated that:

> Except as hereby amended, the Lease shall *remain in full force and effect* as originally written.

*Id.* ¶ 4 (emphasis added).

For a period of more than three years thereafter, from February 1998 to May 2001, the Landlord continued to accept Ames Realty II's continued tenancy.[32] It

---

2001 letter from Norman Ebenstein ("Given the fact that Ames Department Stores, Inc. had no residual rights, and no options to extend were ever exercised by *Ames Realty II, Inc.* for any stores, Ames Realty II has been occupying the stores as a holdover tenant since the expiration of the last term of each lease."). But this plainly self serving letter, which merely asserts a legal contention, both comes too late in the day and is insufficient to controvert the objective meaning of the Ames Defendants' communications. Indeed, it confirms that the

Landlord knew exactly what the Ames Defendants had been seeking to do.

**31.** *See* Landlord's Br. at 9–10 ("Ames Realty, and only Ames Realty, had the right and authority to extend the lease after it was assigned. It is well-settled in Virginia that renewal rights, like all lease rights, pass with the leasehold.")

**32.** The Court intentionally uses the words "continued tenancy," rather than acceptance of rent. It had been understood since 1992

was only thereafter that the Landlord raised the issue of allegedly defective renewal. This approach—securing the benefits of the agreement for a three-year period, and then contending that the agreement can be terminated at the Landlord's will thereafter—is unacceptable. It runs contrary to the basic principle that contracts have mutuality of obligation.

The second arises from the Landlord's failure to raise the alleged defect in exercise of the option in the period from the time of option exercise, in December 2000, and the deadline for exercising it, some six weeks later. Throughout this time, the Landlord knew, if it mattered, that Ames Realty II was the tenant-of-record, and knew the manner of exercise of the option. But it did not speak, and its failure to speak deprived the Ames Defendants (and Ames Realty II in particular, if it mattered) the opportunity to cure the alleged defect, if it was one, which easily could have been done with the stroke of a pen.[33]

The Landlord responds by saying that under Virginia law, it did not have a duty to speak.[34] The Landlord contends that it had no duty to speak when it received the allegedly deficient 2000 Exercise Letter, but fails to cite or any law that supports this proposition. Instead, the Landlord appears to rely solely on its conclusory contentions and Section 4(B) of the Lease, which states in relevant part, "... the term [of the lease] shall be extended upon the giving of notice without the requirement of any action on the part of the Landlord," (Lease § 4(B)). The Landlord's reliance on this section is misplaced. This section excuses the Landlord from making an affirmative response when the lessee has properly exercised its option. It does not, however, excuse the Landlord from the converse. The Court finds that there was duty to speak under the laws of Virginia if, as the Landlord now contends, the notice of the Lease Extension was invalid in its eyes.

Under Virginia law circumstances can create a duty to speak:

In the conduct of various transactions between persons involving business dealings, commercial negotiations, or other relationships relating to property, contracts, and miscellaneous rights, there are times and occasions when the law imposes upon a party a duty to speak rather than to remain silent in respect of certain facts within his knowledge, and thus to disclose information, in order that the party with whom he is

---

that the rent would be paid by Ames Department Stores, and though the matter might have greater relevance at the time of a trial, the Court does not attach significance, on this motion for summary judgment to the fact that the rent was paid by Ames Department Stores, rather than Ames Realty II.

**33.** Though it is not determinative of the Motion, the Court recognizes the possibility, if not likelihood, that neither side focused on "the correct corporate name" of the tenant in possession of the premises at the time the option was exercised, either in December 1995 or December 2000. But aside from the fact that the Ames Defendants unequivocally and unambiguously gave notice of their intention to exercise, the course of dealings never-theless creates an estoppel. The Landlord was on notice of the true facts, and being on notice, failed to raise any protest. The Court will not countenance a scenario under which the Landlord could 5–1/2 years after the December 1995 Exercise Letter; more than three years after its acknowledgment in the 1998 Amendment that the Lease had been extended; and six months after the December 2000 Exercise Letter, raise the issue of the "correct corporate name" when the Landlord went back over the relevant documents in May when the Lease was no longer to its liking.

**34.** *See* Landlord's Br. at 12.

dealing may be placed on an equal footing with him.

. . .

Among other ways, the obligation to communicate facts may arise . . . from the fact that he is placed or places himself in a position where his silence will convey a false impression[.]

*Wojcik v. Burgess*, 40 Va. Cir. 96 (1995).

In the case before this Court, the Ames Defendants had been involved in repeated and continual dealings with the Landlord with respect to the Lease. The Landlord could, if it wished, raise an issue as to the validity of the option exercise, as it then had all of the facts on which it now relies. However, the Landlord remained silent; this left the Ames Defendants with the impression that December 1995 Exercise Letters extended the Lease, an impression that was bolstered by the Landlord's prior ratification of the 1995 Lease extension in the 1998 Amendment, and the collection of rent for nearly five years after the 1995 Exercise Letter.

In *In re Q.T., Inc.*, 118 B.R. 47 (Bankr. E.D.Va.1990), a case with similar but weaker facts,[35] the court held that a landlord's silence following the receipt of a debtor's notice exercising a right to purchase realty, coupled with the expending of resources on the realty in reliance on the purchase, estopped the landlord from later asserting there was a default that barred the debtor from purchasing the realty. In finding for the debtor, that court stated:

Thus, following the debtor's attempt to exercise its option to purchase the property, [the landlord] had ample opportunity to voice its objections, yet remained silent. To permit [the landlord] to assert the debtor's default when it stood

by and allowed the debtor to expend time, effort and money in the belief that it could remain in the property would be patently inequitable.

*Id.* at 51.

Having spoken once (by its acknowledgment), the Landlord no longer could hide behind an alleged absence of a duty to speak, even assuming, arguendo, that the Landlord otherwise would have no duty to speak. Particularly where, as here, any alleged defect could easily have been corrected if the Landlord had timely voiced the complaints upon which it now relies, the Court cannot and will not countenance a conclusion under which a party to a contract can, after the fact, convert a contract with mutuality of obligation into one that can be terminated or renegotiated upon the Landlord's whim.

Both conclusions are supported by the decision of the Ninth Circuit Court of Appeals in *In re The Circle K Corp.*, 127 F.3d 904 (9th Cir.1997). There, as here, a landlord in a bankruptcy adversary proceeding sought a judicial declaration that its tenants had not validly exercised options to extend their leases. *Id.* at 907. There, as here, the landlord conceded that the tenants provided written notices purporting to extend them, but the landlord argued that the written notices were invalid, because at the time they were made, the tenants assertedly exercising them had not yet received assignments of the leases, and hence were not the tenants of record. *Id.* at 909. The Bankruptcy Court entered summary judgment in the tenants' favor; the Ninth Circuit Bankruptcy Appellate Panel affirmed; and the Ninth Circuit (in a decision joined in by late Supreme Court

---

**35.** In that case, the debtor was potentially in default under the terms of its lease because the leased realty was in a state of disrepair. Here there is no contention that the Ames Defendants were in default, and the only issue is the contention (rejected by the Court for three separate reasons) that the options were not duly exercised.

Justice White, sitting as a Circuit Judge by designation) affirmed. *Id.*

In its decision, the *Circle K* court noted that the renewal notices in question had been tendered in 1987, but the landlord did not object until 1991—continually accepting rent, "and otherwise treat[ing] the [tenants] as lessees for many years." *Id.* at 909. It stated:

> We conclude that the extensions in 1987 are no longer open to challenge. Whether there were any defaults and whether there was any imperfection in the way that the notice was given, all parties acted as if the extensions were effective and any objections to them have long since been waived. *See, e.g., Oxford Properties & Fin. Ltd. v. Engle,* 943 F.2d 1150, 1153–54 (9th Cir.1991). Coleman continually accepted rent from the Debtors and otherwise treated the Debtors as lessees for many years after 1987. Coleman is estopped from asserting now, ten years later, that the leases expired in 1987. *See id.* The leases thus remained effective for the five-year term from 1987 to 1992.

*Id.*

Of course the Ninth Circuit's decisions in each of *Circle K* and *Oxford Properties* were not decided under Virginia law, but the decision in each (and particularly *Oxford Properties,* which relied on common law decisions decided under the law of diverse states) was merely exemplary of common law principles that are basic to contract law generally.

■ Creating closer questions, but ultimately not dispositive to the Court, is the reliance by each of the *Circle K* and *Oxford Properties* courts on principles of waiver, and the fact that the lease here provided that:

> Failure of either party to complain of any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder.

(Lease § 22).

However, this Court does not believe that language of that character can be stretched as far as the Landlord urges, to defeat the estoppel claim made here. The Ninth Circuit, in *Circle K,* based its decision not just on waiver; it also adverted to estoppel. *See* 127 F.3d at 909 ("Coleman is *estopped* from asserting now, ten years later, that the leases expired in 1987") (emphasis added). Moreover, and more fundamentally, the Court is unwilling to countenance a party's effort to seize upon an alleged defect when timely protest, if indeed it was sincere, would have provided an opportunity to cure any and all alleged defects. The Landlord acknowledged, in 1998, that the exercise of the option in the exact same manner in 1995 had resulted in a valid extension. It could not later change the rules of the game, in 2001, particularly after the time for curing any alleged defect in the exercise of the option had come and gone.

This is not, in the Court's view, about requiring a party to a contract to accept less than full performance of a contract by its counter-party, as waiver cases so often are. It is rather about whether a party should be estopped from taking a position that, if accepted, would destroy the mutuality of obligation of contracts, one of the most fundamental underpinnings upon which the law of contracts is based. The Landlord cannot be allowed to bide its time until the Lease was no longer in its interest and then spring its objection only when it serves its interest.

IV.

■ The Ames Debtors seek summary judgment on the further ground that

forfeiture of the Falls Church Store Lease would be violative of the equitable doctrine disfavoring the forfeiture of leases. In Virginia, as elsewhere, "[e]quity generally abhors a forfeiture." *Pence v. Tidewater Townsite Corp.*, 127 Va. 447, 103 S.E. 694 (1920); *cf. Duncan v. G.E.W., Inc.*, 526 A.2d 1358 (D.C.1987) ("all three jurisdictions [District of Columbia, Maryland and Virginia] abhor a forfeiture and will permit equity to intervene if the circumstances are compelling" citing *McClellan v. Ashley*, 200 Va. 38, 104 S.E.2d 55, 58 (1958)).

In *McClellan*, where (unlike here), a tenant had missed the deadline for exercise of an option to renew a commercial lease, due to "mere inadvertent neglect," *id.*, 104 S.E.2d at 57, the court declined to grant relief of the forfeiture, but it stated that in circumstances where there are "equitable grounds for such relief, such as fraud, mistake, surprise or accident," equity could properly "relieve the lessee of the consequences of his failure to give the [proper] notice." Here, where timely notice was given and the deficiency, if it was a deficiency, was the failure only to expressly specify the exact tenant of record, and where there was no doubt as the lease in question and the intent to extend, the Court believes that this is a classic example of nothing more than mistake, and (since, the Landlord's May 2001 position was a reversal of its position in February 1998, when it acknowledged the validity of the 1995 extension, in the same manner), surprise—even if it were to be assumed that the Virginia Supreme Court's recitation of a seemingly non-exclusive list ("such as") were in any way restrictive.[36] Indeed, in *Sentara Enterprises, Inc. v.*

*CCP Associates*, 243 Va. 39, 413 S.E.2d 595 (1992), the Virginia Supreme Court observed that despite a tenant's negligence in connection with a lease extension, the anti-forfeiture doctrine still could apply if such negligence resulted from the tenant's mistake or was affected "by the landlord's conduct," 413 S.E.2d at 597–98—both of which the Court has no trouble finding here. With the Landlord having acknowledged the effectiveness of the December 1995 extension without complaint, and with the Landlord having failed to timely notify the tenant of the claimed deficiency upon receipt of the December 2000 Exercise Letter, this is, in the Court's view, a classic case for the application of those principles.

 The Second Circuit has noted that "bankruptcy courts, as courts of equity, should look with disfavor on contract forfeitures." *In re Lavigne*, 114 F.3d 379, 387 (2d Cir.1997). While that principle necessarily has limits, and in particular cannot be regarded as a license to disregard material breaches of contract, here we are faced with no such thing. Once more, this is not, in any way, about depriving a party of the fruits of its contract, or the benefit of its bargain. It is, rather, about the Landlord's effort to deprive its contract counterparty of the fruits of its contract by seizing on what was a technical mistake, at best, and evade its side of the bargain when it no longer finds the contract to its liking.

### Conclusion

Summary judgment is granted in the Ames Defendants' favor on all three of the argued grounds. The Ames Defendants

---

**36.** *See supra* n. 33. Avoiding a forfeiture based on mistake or surprise is particularly appropriate if, as appears to be the case, neither side focused on the "correct corporate name" in either December 1995 or December 2000, and the deficiency, if it was one, did not come to the Landlord's attention until May 2001, when the Landlord, having "recently had occasion to review our leases and correspondence dealing with all our Ames stores" (Ltr. of May 1, 2001, Ebenstein Aff. Exh. 1–E), raised the issue.

shall settle a combined order and judgment in accordance with the foregoing on three business days' notice, by hand or fax. The time to appeal from the resulting order and judgment shall run from the time of its entry, and not from the time of this decision.